In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2232

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUAN FLORES-OLAGUE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 11-cr-136-bbc—**Barbara B. Crabb,** *Judge.*

ARGUED JANUARY 24, 2013—DECIDED MAY 23, 2013

Before MANION and WOOD, *Circuit Judges*, and
BARKER, *District Judge.**

BARKER, *District Judge.* After pleading guilty to one
count of possession with intent to distribute cocaine
and one count of possession of a firearm in furtherance
of a drug trafficking crime, Juan Flores-Olague was sen-

* The Honorable Sarah Evans Barker, United States District
Court for the Southern District of Indiana, sitting by designation.

tenced to 168 months of incarceration, followed by three years of supervised release. This penalty incorporated a relatively recent sentencing enhancement under U.S.S.G. § 2D1.1(b)(12) for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance." Mr. Flores-Olague has timely appealed his sentence to challenge the application of this enhancement to his punishment. Because we find no merit in his arguments, we affirm his sentence.

## I. BACKGROUND

In 2008, law enforcement officers identified Mr. Flores-Olague as a potential large-scale distributor of cocaine, which he had received from Miguel Gamez and sold out of his southern Wisconsin residence. The Dane County Narcotics and Gang Task Force eventually undertook a plan to dismantle Mr. Flores-Olague's operation using a confidential informant and an undercover officer to make a series of controlled purchases of cocaine. Between September 29, 2010 and November 16, 2011, Mr. Flores-Olague sold a total of 39.1 grams of cocaine[1] to the law enforcement officers in seven separate transactions. Each purchase took place at a house in Medina, Wisconsin which, during the relevant time period, was home to Mr. Flores-Olague, Modesta Santos (his longtime girlfriend), and the couple's teenage son.

---

[1] This amount may not take into account the "tip" Mr. Flores-Olague sometimes gave a purchaser, which consisted of an additional small bag of cocaine.

Having marshaled sufficient probable cause based on the foregoing transactions, officers obtained and executed a search warrant for Mr. Flores-Olague's residence on November 17, 2011. The search yielded nine grams of cocaine packaged in eleven baggies, $53,620 in cash, four firearms,[2] ammunition, five cellular phones, twenty-one money wire receipts, a concealment safe, and various drug- and gang-related paraphernalia.

While other law enforcement officers were executing the search warrant, Mr. Flores-Olague and Ms. Santos were speaking with Marshall Police Department officers in separate rooms at the department headquarters. Mr. Flores-Olague waived his *Miranda* rights when officers informed him that his residence was being searched. After recanting his initial denial of having firearms in the home, he also disclosed that he had purchased and sold cocaine over a three-year period out of his residence. During that time, he had distributed cocaine on a daily basis, maintained a customer base of at least ten regular buyers, and sold between two and ten grams of cocaine per day. He further admitted that he was in the United States illegally and had unlawfully purchased a Social Security number.

Ms. Santos's interview with law enforcement officers supplied additional relevant facts consistent with those recounted by Mr. Flores-Olague. To her knowledge,

---

[2] Although law enforcement officers actually recovered five firearms, only four of these firearms were found to be connected to drug trafficking activity.

Mr. Flores-Olague worked part-time on a farm in exchange for free rent and had no other significant or regular source of income. She also reported that Mr. Flores-Olague was extremely domineering and abusive—*e.g.*, that he controlled all the basic activities at their home, such as answering the door and telephone, and that he relegated her to their son's bedroom when guests came to the home. Though she claimed to have been unaware of any firearms in the residence, she said that Mr. Flores-Olague had previously threatened her with a gun. Ms. Santos's statements to law enforcement investigators are consistent with evidence set out in the Presentence Investigation Report ("PSR") detailing Mr. Flores-Olague's prior criminal convictions for carrying a concealed weapon and battery. (PSR at 10-11.)

On December 8, 2011, a grand jury in the Western District of Wisconsin indicted Mr. Flores-Olague for distributing a cocaine mixture, possessing a cocaine mixture with intent to distribute, and possessing a firearm in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c). The first of these three counts was eventually dismissed on the government's motion. In February 2012, Mr. Flores-Olague agreed to plead guilty to the other two counts in the indictment (the possession with intent to distribute and the firearm charges) via a written plea agreement. He appeared before the district court on February 27, 2012, at which hearing the court provisionally accepted the plea agreement pending a thorough review of the PSR.

The PSR recommended a total offense level of 29. When preparing the report in accordance with the November 2011 version of the advisory guidelines, the probation officer computed a base offense level of 30 and then deducted three points for acceptance of responsibility. Based on her conclusion that Mr. Flores-Olague had operated his home as a "stash house," the probation officer included that enhancement and recommended a two-level increase. This sentencing guideline enhancement, which applies to a defendant who "maintain[s] a premises for the purpose of manufacturing or distributing a controlled substance," became effective on November 1, 2010. U.S.S.G. § 2D1.1(b)(12) & App. C amend. 748 (Nov. 1, 2010). Thus, the probation officer computed Mr. Flores-Olague's adjusted offense level as 29. This level, combined with Mr. Flores-Olague's criminal history category of III, produced a recommended sentencing range of 108 to 135 months for the drug charge and 60 months consecutive for the firearm charge.[3] Mr. Flores-Olague objected to the § 2D1.1(b)(12) enhancement on the grounds that he did not maintain the subject premises for the sole purpose of selling

---

[3] 18 U.S.C. § 924(c) prescribes a mandatory minimum penalty of five years of incarceration for possessing a firearm in furtherance of a drug trafficking offense. This punishment must be imposed to run consecutively with any other term of incarceration, "including any term of imprisonment imposed for the . . . drug trafficking crime during which the firearm was used, carried, or possessed." *See id.* § 924(c)(1)(D)(ii).

drugs. The district court overruled his objection and accepted the factual findings and calculations in the PSR, which included the § 2D1.1(b)(12) enhancement to Mr. Flores-Olague's sentence.

Mr. Flores-Olague appeared for sentencing on May 11, 2012. When he renewed his objection to the § 2D1.1(b)(12) enhancement on the basis that the residence was not used exclusively as a "stash house," the district court again rejected his argument. The court observed, "The point is that even though the defendant's family lived in the house with him, he stored and sold drugs from that house for more than three years and did so on a daily basis to regular customers." (Tr. at 5.) The court also concluded that the firearms, cocaine, and cash recovered from Mr. Flores-Olague's home militated in favor of the two-level enhancement. At that point, the court declared that the § 2D1.1(b)(12) enhancement would apply, noting specifically, "I'm *only* imposing the two-level increase because you maintained the premises for the purpose of manufacturing or distributing a controlled substance." (Tr. at 9, emphasis supplied.)

The court next addressed the statutory purposes of sentencing laid out in 18 U.S.C. § 3553(a). For purposes of our review of Mr. Flores-Olague's contention, *infra*, that the district court's discussion of the § 3553(a) factors undermined the validity of his sentence, we reprise the judge's relevant comments:

> You're in the country illegally and you do not speak English. You have a prior criminal record that involves repeated instances of domestic abuse. You

continued to abuse women even after you were granted a deferred prosecution in another case. Despite probation terms and jail sentences, you have continued to break the law.

You have one son and some employment history. You've sold significant quantities of cocaine since 2008. A confidential informant told officers that you had sold kilograms of cocaine out of your residence. And of course a series of controlled buys were conducted at your home which led to the discovery of cocaine, cash, and four firearms.

Taking into consideration the nature of the offense, as well as your personal history and characteristics, I'm persuaded that a combined custodial sentence of 14 years is reasonable and no greater than necessary to satisfy the statutory purposes of sentencing.

(Tr. at 10.) The judge concluded the hearing by imposing a sentence of 168 months of incarceration (108 months on Count Two and 60 months consecutive on Count Three), followed by three years of supervised release (with the special conditions recommended in the PSR). Final judgment was entered on May 14, 2012, and Mr. Flores-Olague filed his notice of appeal of his sentence on May 22, 2012.

## II. ANALYSIS

The sole issue Mr. Flores-Olague presents on appeal is whether the district court erred in imposing the U.S.S.G. § 2D1.1(b)(12) sentencing enhancement in con-

nection with Count Two of the indictment. His challenge in that context, however, is twofold. First, he contends that this enhancement is factually inapplicable to his case. Second, he argues that the district court's comments at his sentencing hearing "ventured too far from the relevant record" and provided an insufficient basis for the § 2D1.1(b)(12) enhancement. Our review of these objections proceeds as follows: we review the district court's application of the U.S. Sentencing Guidelines *de novo* and its underlying factual findings for clear error. *United States v. Dortch*, 628 F.3d 923, 925 (7th Cir. 2010).

We begin with a review of the district court's factual findings, which we may override "only if, after considering all the evidence, we cannot avoid or ignore a 'definite and firm conviction that a mistake has been made.'" *United States v. Jackson*, 598 F.3d 340, 344 (7th Cir. 2010) (quoting *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009)). To that end, we note the district court's acceptance of the PSR's key factual findings, which reflected that Mr. Flores-Olague had stored and sold cocaine "for the past three years" to "ten regular customers and . . . additional customers . . . [who came] to his home to purchase" it and that "officers had located four firearms in his home." (PSR at 6.) Counsel for Mr. Flores-Olague did not contest any of these facts at sentencing. In fact, when requesting that a lesser sentence be imposed, counsel asserted that her client "[was not] . . . holding on to any of the firearms while he

was outside on his porch[4] conducting business." (Tr. at 6.) This comment tacitly validates the information in the PSR as well as the findings made by the district court at sentencing regarding the nature and extent of Mr. Flores-Olague's illegal drug dealing and gun possession. In light of counsel's indirect concession and Mr. Flores-Olague's failure to interpose any objections to the PSR's findings, we cannot conclude that the district court clearly erred in reaching its findings of fact.

Having no basis to set aside the district court's factual findings, we next review *de novo* the court's application of those facts to the elements of U.S.S.G. § 2D1.1(b)(12). This advisory guideline originated as part of the Fair Sentencing Act of 2010, which was enacted on August 3, 2010 to "restore fairness to [f]ederal cocaine sentencing." Pub. L. No. 111-220, 124 Stat. 2372, 2372 (2010). The statute vested emergency authority to amend the advisory guidelines with the U.S. Sentencing Commission. *Id.* § 8, 124 Stat. 2374. Pursuant to that authorization, the Sentencing Commission promulgated Emergency Amendment 748, which took effect November 1, 2010. *See* U.S.S.G. App. C, Vol. III at 374-81. This amendment, *inter alia*, revised the

---

[4] In addition, we cannot say that the district court clearly erred by failing to address whether any "porch activity" was deemed to have occurred on the "premises." The Supreme Court recently confirmed the well-settled principle that a porch is "the classic exemplar" of the home and a place "to which the activity of home life extends." *Florida v. Jardines*, 133 S. Ct. 1409, 1415 (2013) (citation omitted).

advisory guidelines' Drug Quantity Table, directing a two-level sentence enhancement "if . . . the defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in . . . 21 U.S.C. § 856." U.S.S.G. § 2D1.1(b)(12) (Supp. Nov. 1, 2010); *see also United States v. Miller*, 698 F.3d 699, 705 (8th Cir. 2012). The amendment also included Application Note 28 to guide courts' implementation of § 2D1.1(b)(12):

> Subsection (b)(12) applies to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance.[5]

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (*e.g.*, owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the

---

[5] When this amendment was officially promulgated, the first sentence was changed to read, "Subsection (b)(12) applies to a defendant who knowingly maintains a premises . . . for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." 76 Fed. Reg. 24,960, 24,963 (May 3, 2011).

defendant's primary or principal uses for the premises, rather than one of the defendant's incidental
or collateral uses for the premises. In making this
determination, the court should consider how frequently the premises was used by the defendant
for manufacturing or distributing a controlled substance and how frequently the premises was used
by the defendant for lawful purposes.

U.S.S.G. § 2D1.1, comment. (n.28). Amendment 748 was
given retroactive effect in Amendment 750, which took
effect November 1, 2011. *See* 76 Fed. Reg. 41332-35 (July 13,
2011).

Because § 2D1.1(b)(12) refers to 21 U.S.C. § 856, we
include a review of the applicable provisions of this
statute as well. Colloquially known as the "crack-house
statute," 21 U.S.C. § 856 makes it unlawful to "knowingly
open, lease, rent, use, or maintain any place, whether
permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance."
21 U.S.C. § 856(a)(1); *see Miller*, 698 F.3d at 705; *United
States v. Shetler*, 665 F.3d 1150, 1162-63 (9th Cir. 2011);
*United States v. Acosta*, 534 F.3d 574, 591-92 (7th Cir. 2008).
Our court has addressed what it means to "maintain" a
stash house, in *Acosta*, 534 F.3d at 591, concluding
that 21 U.S.C. § 856 contemplates "[a] variety of factual
scenarios." Specifically, we indicated that "an individual
'maintains' a drug house if he owns or rents premises,
or exercises control over them, and for a sustained
period of time, uses those premises to manufacture,
store, or sell drugs, or directs others to those premises to

obtain drugs." *Acosta*, 534 F.3d at 591 (citing *United States v. McCullough*, 457 F.3d 1150 (10th Cir. 2006) (defendant "maintained" premises where drugs were located and which she owned and considered her home); *United States v. Scull*, 321 F.3d 1270 (10th Cir. 2003) (defendant "maintained" premises where drugs were assembled and which he owned)). We clarified that although ownership is not dispositive of whether a defendant "maintains" a stash house, the statute contemplates a defendant who is "more than a casual visitor." *See id.* Moreover, we determined that a defendant's drug trafficking activities at other locations were irrelevant to the "maintaining the premises" inquiry so long as customers knew they could—and did—purchase drugs from the defendant at the premises in question. *Id.*

   Here, the government contends that our analysis of "maintaining" a stash house for purposes of 21 U.S.C. § 856, as articulated in *Acosta*, should factor into our interpretation of § 2D1.1(b)(12), and we agree. We cannot accept Mr. Flores-Olague's argument that such an application would eviscerate Application Note 28's directive to consider the frequency of his drug trafficking transactions. In fact, our 21 U.S.C. § 856 decisions almost always involve the numerical extent of defendants' drug-related activities. *E.g.*, *United States v. Sanchez*, 710 F.3d 724, 731 (7th Cir. 2013); *United States v. Phillips*, 239 F.3d 829, 836-37, 847 (7th Cir. 2001); *United States v. Rogers*, 89 F.3d 1326, 1329-30 (7th Cir. 1996); *United States v. Church*, 970 F.2d 401, 406 (7th Cir. 1992). Likewise, we reject Mr. Flores-Olague's assertion that relying on 21 U.S.C. § 856 case law would make

§ 2D1.1(b)(12) available any time a defendant manu-
factures or distributes drugs on certain premises more
than a single time. Nevertheless, as we recently ob-
served in *United States v. Sanchez*, 710 F.3d 724, 729 (7th
Cir. 2013), "[Application Note 28]'s call to compare
the frequency of illegal and legal activities at premises
leads to odd results when the premises also serve as
a primary residence." *Sanchez* stands as our first substan-
tive interpretation of § 2D1.1(b)(12) and binds us here,
supporting the imposition of the § 2D1.1(b)(12) enhance-
ment to Mr. Flores-Olague's sentencing guidelines cal-
culation.

We note as well that the factual underpinnings of
*Sanchez* bear a striking resemblance to those presented
by Mr. Flores-Olague. In that case, the defendant pled
guilty (although not pursuant to a written plea agree-
ment) to the offense of conspiracy to possess with
intent to distribute more than five kilograms of a cocaine
mixture. *Sanchez*, 710 F.3d at 726. Over the course of
approximately two years, Mr. Sanchez received, stored,
and sold narcotics out of a rented home he shared
with several family members. *Id.* at 725-26. Other dis-
tributors and wholesalers sometimes came to his home
to purchase drugs and to settle financial matters related
to the drug dealing conspiracy. *Id.* at 732. As the largest
wholesaler for that particular drug ring, Mr. Sanchez's
illicit activities boosted cocaine sales by that conspiracy
to the level of $2.5 million. His part involved exercising
substantial control over the premises, "hid[ing] the
drugs in the attic" away from family members, and
"quickly transferring them" whenever possible. *Id.* at 725.

Finally, like Mr. Flores-Olague, his only regular and reliable source of income stemmed from proceeds of drug trafficking activities. *Id.* at 732. All of the foregoing facts persuaded us that Mr. Sanchez's use of his home for proscribed drug sales was more than "incidental" or "collateral"—indeed, the quantity, scope, and importance of the sales rendered it a principal use of the premises. Accordingly, we upheld the district court's application of § 2D1.1(b)(12) to Mr. Sanchez's already lengthy prison sentence.

As noted in *Sanchez*, we again find informative and persuasive the approach taken by the Eighth Circuit in *United States v. Miller*, 698 F.3d 699 (8th Cir. 2012). *Miller* involved a challenge to a § 2D1.1(b)(12) enhancement based on the defendant's use of the premises both for drug dealing and as her family home. *Miller*, 698 F.3d at 705-06. Pursuant to the relevant U.S.S.G. application note, the Eighth Circuit addressed the "frequency-of-use" factor, referencing 21 U.S.C. § 856 as follows:

> When the premises in question was the defendant's family home, by definition it was used for that lawful purpose 100% of the time. Yet Congress in enacting [21 U.S.C.] § 856 and in directing the Commission to adopt § 2D1.1(b)(12) surely intended to deter the manufacture and distribution of illegal drugs in "crack houses" where children are being raised. Thus, prior decisions have upheld [21 U.S.C.] § 856 convictions where [the] defendant used the premises in question as a primary residence as well as for substantial drug trafficking.

*Id.* at 707 (citing *Shetler*, 665 F.3d at 1163; *McCullough*, 457 F.3d at 1161; *Church*, 970 F.2d at 406). The court in *Miller* broadened its inquiry to include consideration of a variety of other factors germane to the scope of illicit activities—quantities dealt, customer interactions, storage of "tools of the trade," maintenance of business records, the use of a child to deliver narcotics, and acceptance of payment—and as indicia that drug trafficking was the principal use of the premises. *Id.* at 706-07.

Employing the approach taken in *Sanchez* and *Miller*, we are left with virtually no doubt as to the proper outcome here; considering both the frequency and significance of the illicit activities conducted on the premises, application of the § 2D1.1(b)(12) enhancement to Mr. Flores-Olague's sentence is clearly warranted. As noted previously, the undisputed facts set out in the PSR establish that Mr. Flores-Olague's drug trafficking was for him an everyday occurrence. In addition, Mr. Flores-Olague neither contested the district court's factual findings that he sold and stored drugs at his home nor denied that he did so "on a daily basis" over a three-year period. Likewise, no other locations for drug dealing appear of record, and Mr. Flores-Olague did not attempt, as Miller did, to demonstrate that he imposed any limitations on the times when he stored or sold drugs at the premises. These facts, considered in light of the *Sanchez* and *Miller* frequency analyses (two-year period and participation in three purchases, respectively), lead us to conclude that the prohibited activities that were conducted by Mr. Flores-Olague at his home are sufficient to warrant the sentencing enhancement under § 2D1.1(b)(12).

It should be noted that in conducting this analysis, our consideration of the frequency and significance of illicit activities at the premises treats these factors "in tandem" in the same way we did in *Sanchez*. That Mr. Flores-Olague's role may not have made him as "renowned" in his enterprise as Sanchez or Miller were in theirs does not foreclose a finding that his drug sales were also "significant—in quantity, in scope, and in importance to . . . [his] livelihood." *Sanchez*, 710 F.3d at 732. Further, we see no error in the district court's reliance on the $53,620 in currency found on the premises along with the four firearms, five cellular phones, and other paraphernalia, all of which were also found in his home, to justify this enhancement. We view Mr. Flores-Olague's abusive and authoritarian treatment of the home's co-residents as further evidence suggestive of his intent to control the home, its residents, and all activities occurring there, both legal and illegal. *See United States v. Morgan*, 117 F.3d 849, 858 (5th Cir. 1997) (proper to infer that defendant has "maintained" the premises "[w]here the evidence shows that over a period of time the defendant can direct the activities of and the people in a place"). And, while we concede that his intermittent employment as a day laborer corroborates a finding that to some extent he was engaged in gainful activity other than drug dealing, the district court's conclusion that his primary source of livelihood was his drug dealing is sound. Nothing supports a finding that Mr. Flores-Olague's use of the premises for drug trafficking was incidental or collateral; to the contrary, the evidence in the record clearly establishes that

his home was used by him in major respects for drug-
related purposes. Thus, we reject his argument that
the § 2D1.1(b)(12) enhancement is factually inapposite.

Mr. Flores-Olague has also challenged the § 2D1.1(b)(12)
enhancement to his sentence on the basis that "the
district court's comments at sentencing ventured too
far from the relevant record." (Appellant Br. at 3.) Specifi-
cally, he contends, the district court in fashioning
his sentence improperly referenced his being a non-
English-speaking person, his status as an illegal
immigrant and father, and his history of domestic vio-
lence. Our Supreme Court has instructed that "a sen-
tencing judge should set forth enough to satisfy the
appellate court that [s]he has considered the parties'
arguments and has a reasoned basis for exercising [her]
own legal decisionmaking authority." *Rita v. United
States*, 551 U.S. 338, 356 (2007). In keeping with this man-
date, the district judge is required to meaningfully
weigh the § 3553(a) factors, the advisory guidelines, and
the particular circumstances of each case. *United States
v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008). An exhaus-
tive recitation of the § 3553(a) factors is not required;
rather, "the court may simply give an adequate state-
ment of reasons, consistent with § 3553(a), for thinking
the sentence it selects is appropriate." *Id.*

Even a cursory review of the sentencing hearing tran-
script before us makes abundantly clear that the
district judge fully satisfied the foregoing standard(s). In
fact, after reviewing the record, we regard Mr. Flores-
Olague's arguments in this respect as "grasping at

straws." We begin by correcting Mr. Flores-Olague's contention in his reply brief that the district court judge announced his sentence following her comments about his personal characteristics. In truth, the hearing transcript reveals the following words as actually having been spoken by the judge: "I'm *only* imposing the two-level increase because you maintained the premises for the purpose of maintaining or distributing a controlled substance." (Tr. at 9, emphasis supplied.) This statement was made by the judge prior to any discussion by her of the various factors set forth in 18 U.S.C. § 3553(a). (Tr. at 9-10.) Thus, this sequence makes clear that the two-level enhancement was based exclusively on § 2D1.1(b)(12) and that the § 3553(a) factors mentioned by the judge reflected a down-the-line guidelines analysis. We find nothing improper about the district court's sentencing procedure; to the contrary, in terms of correctness and clarity, the way in which Judge Crabb conducted this hearing provides a model of thorough, cogent, and fair federal sentencing procedure.

To the extent that Mr. Flores-Olague cites various cases in an effort to support his contention that the district judge improperly included in her analysis his personal characteristics, we reject these authorities as off point. The relationship between the rulings in these cases and the matter before us is attenuated at best, and in any event fails to provide a basis for ignoring or undermining the presumption of reasonableness to be accorded a sentence that falls within a properly calculated advisory guidelines range. *United States v. Block*, 705 F.3d 755, 762 (7th Cir. 2013). For instance,

*United States v. Figueroa*, 622 F.3d 739 (7th Cir. 2010), does
not in any way bolster Mr. Flores-Olague's argument.
There, the district court engaged in a distressingly inap-
propriate and irrelevant diatribe about illegal immigra-
tion, "lash[ing] out," "occasionally referring to 'you
people' or 'those people,'" even comparing that de-
fendant to Adolf Hitler. *Figueroa*, 622 F.3d at 743. In
*United States v. Smith*, 400 F. App'x 96 (7th Cir. 2010), the
district court accused the defendant of "ruining Mexico"
and contributing to "broader issues of urban decline."
*Smith*, 400 F. App'x at 98. It is far-fetched to compare
such judicial intemperance to the comments made at
Mr. Flores-Olague's sentencing by Judge Crabb, who
pertinently noted as matters of fact—not hyperbole—that
Mr. Flores-Olague "[was] in the country illegally and . . .
[did] not speak English." Besides being true, these facts
are relevant to a fairly determined sentence because
they reflect the strength of the defendant's ties to the
community as they relate to the likelihood of his
successful post-incarceration adjustments to society.
Accordingly, we reject Mr. Flores-Olague's argument
that this single, isolated statement by the judge tainted
the fairness or appropriateness of the sentence that was
imposed.

We are similarly unpersuaded by Mr. Flores-Olague's
assertion that the district judge allowed other imper-
missible factors to sway her judgment at sentencing.
A sentencing court is well within its prerogatives
and responsibilities in discussing a defendant's status as
a deportable alien. *United States v. Ramirez-Fuentes*, 703
F.3d 1038, 1047 (7th Cir. 2013); *United States v. Panaigua-*

*Verdugo*, 537 F.3d 722, 728 (7th Cir. 2008). Again, this factor is entirely germane to the defendant's "history," which consideration is explicitly required of the district judge under 18 U.S.C. § 3553(a)(1). Indeed, the scope of the district court's historical inquiry is permissibly broad so as "to include 'reliable evidence of wrongdoing for which the defendant has not been charged or convicted.'" *United States v. Vitrano*, 495 F.3d 387, 390 (7th Cir. 2007) (quoting *United States v. Nowicki*, 870 F.2d 405, 407 (7th Cir. 1989)). Evidence of a defendant's violent past is also widely regarded as relevant to a court's 18 U.S.C. § 3553(a) analysis. *Vitrano*, 495 F.3d at 389; *see also United States v. Escalante-Reyes*, 689 F.3d 415, 438 (5th Cir. 2012); *United States v. Bryant*, 462 F. App'x 589, 590 (6th Cir. 2012); *United States v. Lee*, 480 F. App'x 943, 945 (10th Cir. 2012); *United States v. Foy*, 617 F.3d 1029, 1037 (8th Cir. 2010). Given these statutory directives, we find no fault in the district judge's mention of "repeated instances of domestic abuse," which bears directly on Mr. Flores-Olague's criminal history *and* his likelihood of recidivating, and provides corroboration of certain factual assertions made against him as part of this prosecution (*i.e.*, the witness's statements to law enforcement attesting to such abuse).

Finally, Mr. Flores-Olague has failed to convince us that the district judge's statement about his deficient English language skills was in any way untoward. To advance such an argument, the defendant has to take the remark entirely out of context, failing to note, for example, that it references one of the seven § 3553(a) factors that a judge is directed to consider during a sen-

tencing hearing. It is well-settled that a sentencing judge "may 'appropriately conduct an inquiry . . . largely unlimited either as to the kind of information [s]he may consider, or the source from which it might come.'" *Nowicki*, 870 F.2d at 407 (quoting *United States v. Nesbitt*, 852 F.2d 1502, 1521 (7th Cir. 1988)). Thus, as discussed previously, to accuse the district judge of harboring some sort of prejudicial animus against him based on this isolated remark is a bridge too far. Again, a defendant's ability to speak English falls squarely within the purview of § 3553(a); it concerns his history and characteristics, the likelihood of successful deterrence from future criminal conduct, and his need for educational or vocational training while incarcerated. 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(D). English language proficiency can be and often is a useful predictor of whether a defendant can fully assimilate in the culture in order to become a productive member of society upon his release, touching on his future success in putting down roots, obtaining employment, obtaining driving and voting privileges, and otherwise establishing a stable, law-abiding existence in the United States. When language is a barrier, a person so impeded is far more likely to remain isolated in an existence in which respect for the laws of the United States is either irrelevant or holds little value. Each of these considerations reinforces our conclusion that the district judge made no inappropriate, prejudicial, or unlawful comments at sentencing which improperly affected her decision to impose the § 2D1.1(b)(12) enhancement or to impose the sentence she determined to be rea-

sonable under all the appropriate circumstances of Mr. Flores-Olague's case.

### III. CONCLUSION

Mr. Flores-Olague has not rebutted the presumption that his properly calculated sentence of 168 months of incarceration, followed by three years of supervised release, was reasonable. The district judge committed no error in applying a two-level enhancement to Mr. Flores-Olague's sentence for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance," pursuant to U.S.S.G. § 2D1.1(b)(12), nor was the sentencing hearing conducted in any way inconsistent with the dictates of 18 U.S.C. § 3553(a). The sentence imposed by the district court is therefore AFFIRMED.