**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2895
_____

UNITED STATES OF AMERICA

v.

KENNETH IRVING CARTER, a/k/a Kane

Kenneth Carter,
              Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 3-12-cr-00020-001)
District Judge: Hon. Kim R. Gibson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 12, 2016
_____

Before: FUENTES, SHWARTZ, and RESTREPO, <u>Circuit
Judges</u>

(Filed: August 23, 2016)

_____

OPINION

_____

Ronald A. Krauss, Esq.
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101

*Counsel for Appellant Kenneth Irving Carter*

Jane M. Dattilo, Esq.
Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

*Counsel for Appellee United States of America*

SHWARTZ, Circuit Judge.

Kenneth Irving Carter appeals the District Court's application of a two-level sentencing enhancement for maintaining a stash house. Because the District Court properly applied the enhancement, we will affirm.

I

Carter headed a Pennsylvania drug ring, which he operated from Detroit, Michigan. Carter sent two of his lieutenants, Jelina Montez Cook and Dewann Jamal Macon, to Pennsylvania to oversee the business. Carter's operation was further supported by additional "employees," including Arley Earheart.

Cook was responsible for transporting drugs to Pennsylvania and readying them for sale. Macon's primary responsibility was to keep detailed financial records so that he could inform Carter about the drug ring's cash flow. Macon was also responsible for paying expenses, including the salaries of various "employees."[1] All disbursements he made were on Carter's behalf.

Shortly after Macon moved to Pennsylvania, he told Carter that he needed to find new living arrangements. Carter tasked Earheart with finding a house where Macon could live and run the drug operation. Earheart found a secluded house at 530 Stoney Run Road in Blairsville, Pennsylvania ("Stoney Run"), which did not require her to sign a lease or put her name on a utility bill. Earheart obtained Carter's approval to rent the house. Carter later inspected the property and ordered Macon to give Earheart the money for the security deposit and rent. Stoney Run became a base of operations. Macon lived at Stoney Run, overseeing the enterprise's

---

[1] Some members of the conspiracy, such as Earheart, were paid in drugs as opposed to cash.

3

financial and drug operations, and Earheart retrieved drugs from that location for delivery to distributors.[2]

Carter's organization maintained a second house at 621 Bedford Street in Johnstown, Pennsylvania ("Bedford Street"). Cook lived at Bedford Street, and processed and prepared heroin there for delivery to Stoney Run for distribution. As with Stoney Run, Cook paid the Bedford Street rent with funds from Macon, directly authorized by Carter.

Following an investigation, which included searches of the premises and recovery of drugs at each location, a grand jury returned an indictment against Carter and other members of the conspiracy. Carter was charged with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin (Count 1), and conspiracy to distribute and possess with intent to distribute Opana pills, an opioid pain medication (Count 2), all in violation of 21 U.S.C. § 846. Carter pleaded guilty to Count 1 pursuant to a written plea agreement. The plea agreement contained a limited waiver of appellate rights, which allowed Carter to, among other things, challenge application of a two-level sentencing enhancement for maintaining a residence for the purpose of manufacturing and distributing a controlled substance under U.S.S.G. § 2D1.1(b)(12), sometimes referred to as the "stash house" enhancement.

_____

[2] Earheart testified about Carter's involvement in the operation's ongoing activities, specifically noting one occasion when Carter threatened Earheart while she was in the hospital, and ordered her back to the house to continue working.

4

At sentencing, the District Court heard testimony from Earheart and Macon, recounting the facts set forth above concerning Carter, the stash houses, and the role the houses played in Carter's drug ring. Based on their testimony, the District Court found that Carter "control[led] activities at the residences, namely by controlling distribution of controlled substances," and applied § 2D1.1(b)(12)'s two-level enhancement. App. 140. The District Court then sentenced Carter to 180 months' in prison. Carter appeals the application of the enhancement.

## II[3]

### A

The Fair Sentencing Act of 2010 sought to address, among other things, conduct "generally described" in 21 U.S.C. § 856, which criminalized the maintenance of a premises used for drug manufacturing or distribution. See United States v. Jones, 778 F.3d 375, 384 (1st Cir. 2015). To this end, the Act directed the Sentencing Commission to amend the United States Sentencing Guidelines to add an enhancement for defendants engaged in such activity. See United States v. Johnson, 737 F.3d 444, 446 (6th Cir. 2013). The Commission added § 2D1.1(b)(12), which provides for a

---

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. Our review of the District Court's interpretation of the Sentencing Guidelines is plenary, and we review factual findings for clear error. United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).

5

two-level increase for a defendant who "maintained a premises for the purpose of manufacturing or distributing a controlled substance."  For the enhancement to apply, the Government must prove by a preponderance of the evidence that the defendant "(1) knowingly (2) open[ed] or maintain[ed] any place (3) for the purpose of manufacturing or distributing a controlled substance." Johnson, 737 F.3d at 447; United States v. Flores-Olague, 717 F.3d 526, 531 (7th Cir. 2013); United States v. Miller, 698 F.3d 699, 706 (8th Cir. 2012).

Carter does not dispute that the first and third elements are met here.  The record shows that Carter knew about the activities at the properties, as he was intimately involved in the operation of the enterprise, directing both the flow of money throughout the organization and controlling his employees' actions in connection with their drug distribution activities.

Similarly, it is undisputed that both properties were kept primarily to advance the drug enterprise.  See Johnson, 737 F.3d at 449 (enhancement does not apply where storage at the location was an "incidental or collateral use" for the premises).  At both locations, law enforcement found, among other things, drugs and drug paraphernalia.  In addition, both Macon and Earheart testified that Stoney Run was regularly used to store drugs prior to distribution, and the reason for renting the property was to provide Macon a place to live and work while he was "on assignment" at Carter's behest.  It is also undisputed that Bedford Street was a drug factory where Cook prepared product for delivery to Stoney Run and eventual sale.  Thus, the only question before us is whether Carter "maintained" the premises.

6

Although the word "maintained" is not defined in either § 2D1.1(b)(12) or § 856, two sources provide insight into the term's definition. See Jones, 778 F.3d at 384. The Guidelines commentary instructs that, in determining whether the defendant "maintained" the property, we should consider, among other things, (a) whether the defendant "held a possessory interest" such as owning or renting the premises, and (b) "the extent to which the defendant controlled access to, or activities at, the premises."[4] U.S.S.G. § 2D1.1 cmt. n.17. Case law examining § 856, which makes it unlawful to "knowingly open, lease, rent, use, or maintain any place . . . for the purpose of manufacturing, distributing, or using any controlled substance," also provides guidance. Courts interpreting the term "maintain[ing]" in § 856 have looked to a variety of factors such as "control, curation, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity." Jones, 778 F.3d at 384 (quoting United States v. Clavis, 956 F.2d 1079, 1091 (11th Cir. 1992)).

Neither the Guidelines commentary nor the case law interpreting § 856 requires that the defendant be physically present or involved on a daily basis to "maintain" a premises for the purpose of the enhancement. Rather, the enhancement is flexible and adaptable to a "variety of factual scenarios." Flores-Olague, 717 F.3d at 532. A court may consider,

---

[4] We are bound by "Guidelines commentary [] interpreting or explaining the application of a guideline." United States v. Nagle, 803 F.3d 167, 179 (3d Cir. 2015) (quoting United States v. Savani, 733 F.3d 56, 62 (3d Cir. 2013)).

7

among other things, whether a defendant "exercise[d] control over" the property, id., or supervised or directed others to engage in certain activities at the premises, see United States v. Morgan, 117 F.3d 849, 857 (5th Cir. 1997).

Applying these factors, we discern no error in the District Court's application of the stash house enhancement, and reject Carter's arguments to the contrary. Carter's argument that he lacked the possessory interest necessary to have "maintained" the properties because he was not the owner or renter is meritless. Carter appropriately concedes that the absence of his name on a deed or lease is insufficient to preclude the enhancement's application. As the Court of Appeals for the First Circuit observed, "[t]he enhancement does not require either ownership or a leasehold," because "it would defy reason for a drug dealer to be able to evade application of the enhancement by the simple expedient of maintaining his stash house under someone else's name." Jones, 778 F.3d at 385 (internal citations omitted); see also Flores-Olague, 717 F.3d at 532 ("ownership is not dispositive of whether [one] 'maintains' a stash house").

Carter's argument that he did not maintain the stash house because any money used to operate it came from the organization's funds and not his own profits is also unavailing. Undisputed testimony demonstrates that Carter maintained a direct interest in every dollar that came into the organization, and that Macon, in managing the day-to-day business, had to account to Carter for all revenue and expenditures.

In addition to controlling the funds used to rent the properties, Carter played a major role in overseeing the

8

acquisition and operations of the stash houses, despite the fact he lived in Detroit. Macon, who was in Pennsylvania only on orders from Carter, needed Carter's approval to rent the location at which Macon resided and carried out his business for Carter's organization. Carter tasked Earheart with finding Stoney Run, personally approved its acquisition, inspected it after it was secured, and told Earheart to get the necessary funds from Macon to pay the rent. In addition, Carter oversaw the financial management of both Stoney Road and Bedford Street, as he directed Macon to pay the rent and any other expenses, and demanded details about such transactions.

Carter also controlled the activities at each location. At his direction, Bedford Street was used to prepare drugs for distribution. In addition, Carter ensured that his employees were at the house working, going so far as to threaten Earheart while she was in the hospital to ensure she returned to work. Thus, the evidence showed that Carter controlled the activities of his employees and the places where essential parts of the operation were conducted. With such a high level of control, and "[w]here the evidence shows that over a period of time the defendant . . . direct[ed] the activities of and the people in a place," Morgan, 117 F.3d at 858, we cannot say that the District Court erred in finding that Carter "maintained" the stash houses for purposes of applying the enhancement.

III

For the foregoing reasons, we will affirm the judgment of sentence.

9