In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-3016

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JUAN ZAMUDIO,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 16 CR 251 — **Tanya Walton Pratt**, *Chief Judge*.

SUBMITTED SEPTEMBER 9, 2021[*] — DECIDED NOVEMBER 18, 2021

Before KANNE, HAMILTON, and ST. EVE, *Circuit Judges*.

KANNE, *Circuit Judge*. Following an investigation of an Indianapolis-based drug trafficking organization, the government secured a warrant to search Juan Zamudio's residence, where they found large amounts of methamphetamine, a

[*] We granted the parties' joint motion to waive oral argument, and the appeal is therefore submitted on the briefs and the record. FED. R. APP. P. 34(a)(2)(C).

digital scale, and a loaded firearm. Zamudio pled guilty to
two drug-related offenses and was sentenced to 300 months'
imprisonment. Zamudio now challenges three aspects of his
sentence: the district court's calculation of his base offense
level based on the amount of drugs attributed to him; the
court's application of a 2-level firearm enhancement; and the
court's application of a 2-level enhancement for maintaining
a drug premises. We affirm the judgment of the district court
on each of these issues.

## I. BACKGROUND

In 2016, the government began investigating a metham-
phetamine trafficking organization in Indianapolis run by
Zamudio's brother, Jose Zamudio. Jose coordinated the im-
portation of controlled substances from Mexico, and Zamudio
assisted his brother in distributing some of the drugs to co-
conspirators and laundering the proceeds back to Mexico.

That November, agents executed a search warrant for
Zamudio's Indianapolis residence, where they found 10.961
kilograms of pure methamphetamine stored throughout the
garage. Agents also searched Zamudio's vehicle, finding
roughly a pound of meth, a digital scale, and a loaded
Bersa .380 pistol. Zamudio was arrested that same day. At the
time of arrest, he had a round of .380-caliber ammunition in
his pocket.

Zamudio was charged by indictment with four illegal
drug- and firearm-related offenses. He pled guilty to Count 1
(conspiracy to possess with intent to distribute fifty grams or
more of methamphetamine, in violation of 21 U.S.C. §§
841(a)(1) and 846) and Count 11 (conspiracy to launder

monetary instruments (promotion), in violation of 18 U.S.C. § 1956).

The district court held a sentencing hearing at which it heard testimony from an agent who was involved in the investigation. For Count 1, the district court calculated Zamudio's sentence under the Sentencing Guidelines as follows. The court adopted the recommendation of the presentence investigation report ("PSR") and attributed at least 4.5 kilograms of actual methamphetamine to Zamudio, requiring a base offense level of 38 under U.S.S.G. § 2D1.1(a)(5) and (c)(1) – after finding that Zamudio allowed his brother to store nearly 25 pounds of pure methamphetamine in his garage. The court then applied two enhancements as recommended by the PSR: a 2-level firearm enhancement under U.S.S.G. § 2D1.1(b)(1), after finding that the loaded firearm was seized from Zamudio's car; and an additional 2-level enhancement for maintaining a drug premises under U.S.S.G. § 2D1.1(b)(12), after finding that Zamudio stored a large quantity of meth at his residence for several months. Thus, the adjusted offense level for Count 1 was 42. (The district court also determined an offense level of 42 for Count 11, but that sentencing calculation is not at issue.)

Given Zamudio's total offense level of 42, *see* U.S.S.G. § 3D1.3(a), and his criminal history category of I, the guidelines range was between 360 months' imprisonment and life. The district court sentenced Zamudio to 300 months' imprisonment on Count 1 and 240 months' imprisonment on Count 11, to be served concurrently, which reflected a downward variance based on Zamudio's personal history and characteristics.

## II. ANALYSIS

On appeal, Zamudio argues that the district court made three mistakes at sentencing: the district court's base offense level calculation was erroneous because its finding attributing at least 4.5 kilograms of actual methamphetamine to Zamudio was not supported by credible evidence, and the district court erred in applying both the firearm enhancement and the drug premises enhancement to his sentence. We address each issue in turn.

### A. Base Offense Level

Zamudio first contends on appeal that the district court erred when it attributed at least 4.5 kilograms of actual methamphetamine to him and determined a base offense level of 38 under U.S.S.G. § 2D1.1(a)(5) and (c)(1). At sentencing, however, Zamudio only challenged his base offense level on the basis that he should receive a downward adjustment under U.S.S.G. § 3B1.2 as a minimal participant in the criminal activity. The government therefore urges us to review the district court's determination for plain error, rather than clear error, because Zamudio failed to object on the specific grounds he now raises on appeal. Either way, though, we see no error in the district court's determination.

According to Zamudio, there was no evidence presented that he was aware of the 10.961 kilograms of meth seized from his residence or that the drug quantities were reasonably foreseeable to him. *See United States v. Brown*, 822 F.3d 966, 976 (7th Cir. 2016) ("[A] defendant is liable for all of the drugs being sold for which he is directly involved, as well as all other sales which are reasonably foreseeable and within the scope of the conspiracy." (citing U.S.S.G. § 1B1.3(a)(1)(B) cmt. n.2)).

Zamudio maintains that the district court found that the drugs belonged to and were placed in Zamudio's garage by Jose, so there was no basis to attribute the drugs to Zamudio. Appellant's Br. at 18. In fact, however, the district court found that Zamudio admitted to agents that he allowed his brother to store meth in the garage. This finding was supported by Zamudio's earlier proffer to the government in which he acknowledged that his garage had been used to store drugs for several months, as well as the agent's testimony at sentencing that Zamudio stored the drugs in his garage at his brother's "supervision and direction." It was also supported by the PSR, which stated that the residence "was used by Jose Zamudio and Juan Zamudio to store methamphetamine." *See United States v. Longstreet*, 567 F.3d 911, 928 (7th Cir. 2009) ("A district court may rely on a PSR's recommended calculations where the defendant fails to alert the court to potentially inaccurate or unreliable information."). This evidence is sufficient to establish Zamudio's direct involvement with the drugs. Zamudio points to no evidence showing that he was unaware of the meth in his garage.

Zamudio also cannot demonstrate that the drug amounts were not reasonably foreseeable to him or within the scope of the conspiracy. Although he asserts that there was no evidence showing that the meth found in his garage was "involved in the conspiracy," Appellant's Br. at 18, the district court found that Zamudio allowed his brother, "the leader of the conspiracy," to store those drugs in the garage. Zamudio also maintains that his only actions in furtherance of the conspiracy were to sell two pounds of meth and to launder approximately $7,000 in drug proceeds, so he was not aware of the scope of the drug conspiracy. Appellant's Br. at 18.

At sentencing, however, the district court described Zamudio as Jose's "right-hand man" and "number two accomplice" who "played an instrumental role in the conspiracy." For Zamudio's sentence to stand, there must be sufficient evidence to support the district court's assessment of his role in the conspiracy, such that the extent of the sales operation was foreseeable to him. *See Brown*, 822 F.3d at 976.

Based on the government's factual basis for the plea, the PSR, and the agent's testimony, the district court found that Zamudio coordinated the sale of drugs to co-conspirators; agreed to assist his brother in all aspects of the conspiracy, according to intercepted text messages; allowed large amounts of drugs and drug proceeds to be stored in his home; served as an interpreter for Jose in drug transactions; and picked up drug proceeds from other customers and wired the proceeds to the source in Mexico several times. These findings provide ample support for the conclusion that Zamudio played a large role in the conspiracy. Thus, the drug amounts were reasonably foreseeable to him.

In short, the district court did not err in attributing at least 4.5 kilograms of actual methamphetamine to Zamudio, requiring a base offense level of 38.

*B. Firearm Enhancement*

Zamudio next contends that the district court erred in applying a firearm enhancement to his sentence. Section 2D1.1(b)(1) of the Sentencing Guidelines instructs courts to increase the base offense level by 2 "[i]f a dangerous weapon (including a firearm) was possessed." If the government has proved that the defendant actually or constructively possessed a weapon, the defendant then has the opportunity to

show that it is "clearly improbable" he possessed the weapon in connection with the drug conspiracy. *United States v. Thurman*, 889 F.3d 356, 372 (7th Cir. 2018).

The district court applied a firearm enhancement after finding that Zamudio had been surveilled driving his vehicle on multiple occasions during the investigation, including when he delivered drugs to a co-conspirator; that agents found the loaded .380 Bersa pistol, along with a pound of meth and a digital scale, in Zamudio's vehicle; that Zamudio had a round of .380-caliber ammunition in his pocket when he was arrested; and that Zamudio stated, in his earlier proffer to the government, that Jose gave him the gun and he kept the gun in his car. Because the gun was found "in 'close proximity' to illegal drugs," it is "presumed 'to have been used in connection with the drug trafficking offense.'" *United States v. Are*, 590 F.3d 499, 526 (7th Cir. 2009) (quoting *United States v. Souffront*, 338 F.3d 809, 833 (7th Cir. 2003)).

We have upheld the application of a firearm enhancement in similar circumstances, where the firearm was found near drugs and/or drug paraphernalia. *See, e.g.*, *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005) (firearms were found in defendant's home and storage units near drugs and drug paraphernalia); *United States v. Cashman*, 216 F.3d 582, 589 (7th Cir. 2000) (gun was found in defendant's mobile home near a scale and other drug paraphernalia).

Zamudio argues that the firearm seized from his car was unlikely to be used in the drug conspiracy because he had "utilized his vehicle in a drug transaction" only once and there was no evidence that he was likely to do so again. Appellant's Br. at 21. We have found the application of a firearm enhancement to be proper where a gun "was found in a car

that was admittedly used on one occasion, approximately six weeks earlier, to transport a drug shipment," even though there were no drugs present in the car. *United States v. Grimm*, 170 F.3d 760, 768 (7th Cir. 1999). And here, there is even more evidence tying Zamudio's gun to the drug offense, as detailed above.

Zamudio also asserts that his brother stored the firearm along with the methamphetamine inside Zamudio's vehicle without his knowledge, Appellant's Br. at 22, but there is no record support for this assertion. Even accepting Zamudio's assertion, his argument still fails because the district court could properly determine that he actually or constructively possessed a gun found in his car. *See United States v. Morris*, 836 F.3d 868, 873 (7th Cir. 2016) (finding that it was "justifiable" to infer that gun belonged to defendant when it was located in his residence and near his personal effects). The district court did not err in applying the firearm enhancement to Zamudio's sentence.

## C. *Drug Premises Enhancement*

Finally, Zamudio contends that the district court erred in applying an enhancement for maintaining a drug premises to his sentence. Section 2D1.1(b)(12) of the Sentencing Guidelines provides for a 2-level enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." This includes "storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1(b)(12) cmt. n.17.

Zamudio asserts that there was no evidence showing "that the sole purpose of [his] residence was involvement in the drug trade." Appellant's Br. at 24–25. Storing drugs, however,

"need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." U.S.S.G. § 2D1.1(b)(12) cmt. n.17. Although Zamudio maintains that his residence was "a typical residence" and "not an empty store house," Appellant's Br. at 25, residences can still qualify as drug premises for purposes of the enhancement. While the application note advises district courts to consider how frequently the premises was used for lawful versus unlawful purposes, U.S.S.G. § 2D1.1(b)(12) cmt. n.17, courts are "not required to apply a simple balancing test that compares the frequency of unlawful activity at the residence with the frequency of lawful uses," *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017). This is because "such a test would immunize every family home that is also used for drug distribution from being deemed an illegally maintained 'premises,'" given that "the amount of lawful activity in a home is all but certain to exceed the amount of illegal activity." *Id.* (citing *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013)). Instead, "the sentencing court should focus on both the frequency and significance of the illicit activities, including factors such as quantities dealt, customer interactions, keeping 'tools of the trade' and business records, and accepting payment." *Id.* (citing *Flores-Olague*, 717 F.3d at 533, and *United States v. Edwin Sanchez*, 710 F.3d 724, 732 (7th Cir. 2013)).

The district court applied the enhancement after finding that Zamudio acknowledged, in his earlier proffer to the government, that meth had been stored in his garage for two to three months before he was arrested. The agent also testified at sentencing that bundles of meth were found hidden throughout Zamudio's garage, including in the stuffing of a

dog bed stored in a dryer, in an opening in the wall, in the garage door opener's compartment, and in a box of potato chips. Zamudio maintains that the seizure of meth from his garage "represents the only evidence that the residence was ever involved in the drug conspiracy." Appellant's Br. at 25. But even storage of large amounts of drugs alone can justify application of the drug premises enhancement. *See United States v. Acasio Sanchez*, 810 F.3d 494, 495, 497 (7th Cir. 2016) (defendant was paid $1,500 per month to store large drug deliveries every few weeks over the course of a year). Zamudio points out that his residence was used to store drugs "on only one occasion," Appellant's Br. at 3, but the district court's application of the enhancement is further supported here by the fact that more meth and "tools of the trade"—a digital scale and firearm—were seized from Zamudio's vehicle in his garage. *See United States v. Thomas*, 845 F.3d 824, 834 (7th Cir. 2017) (upholding application of enhancement where a "search of the home yielded a digital scale, a cutting agent, and plastic sandwich baggies with the corners cut out"); *Flores-Olague*, 717 F.3d at 534 (holding that evidence supported application of enhancement where firearms and other paraphernalia were found in defendant's home). The district court did not err in applying the drug premises enhancement.

### III. CONCLUSION

For these reasons, we AFFIRM Zamudio's sentence.