In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 16-1047 & 16-1048

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PAUL WINFIELD,

*Defendant-Appellee.*

———————————

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 01-cr-9-bbc-3 & 3:15CR00081-001 — **Barbara B. Crabb**, *Judge.*

———————————

ARGUED DECEMBER 13, 2016 — DECIDED JANUARY 18, 2017

———————————

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

PER CURIAM. These consolidated appeals raise a single is-
sue: whether the district court erred by adjusting Paul Win-
field's offense level upwards based on the court's finding
that Winfield "maintained" his apartment for distributing
controlled substances, *see* U.S.S.G. § 2D1.1(b)(12). Winfield
argues that the guideline doesn't apply here because drug
dealing was not among his "primary or principal" uses for

the apartment, *see* U.S.S.G. § 2D1.1 cmt. n.17. We disagree and affirm the district court's judgments.

A police informant bought heroin and methamphetamine from Winfield during four controlled buys conducted over a twelve-week period. For the buys, all of which occurred at Winfield's apartment, the informant wore a hidden video camera. The camera recorded little useful video, but it did clearly capture the informant's conversations with Winfield.

During the first controlled buy, the informant purchased 3 grams of heroin and reported seeing "a few ounces" of suspected heroin that Winfield had retrieved from a plastic container hidden behind a television.

A week later, Winfield met the informant in a parking lot and asked the informant to follow him home, explaining that he needed to make a "drop" on the way. Winfield then sold the informant 3½ grams of heroin and gave the informant a sample of a substance he said contained ecstasy (later analysis showed that it actually contained methamphetamine). The video of this meeting shows two ounces of suspected heroin, a digital scale, and cash on a kitchen counter.

The third buy took place the following month when Winfield sold the informant another 3½ grams of heroin and a gram of "ecstasy" (again, it actually contained methamphetamine). The informant reported seeing about two ounces of heroin on a plate in the kitchen and an ounce of "ecstasy" hidden in an aerosol can with a hidden compartment.

Over a month later, Winfield sold the informant 2 grams of heroin and 5 grams of a substance containing methamphetamine (not ecstasy, as promised). Winfield retrieved the

drugs from the aerosol can, and the informant said he saw about 60 grams of heroin and 30 grams of "ecstasy."

Three days after this last buy, the police obtained a warrant and searched Winfield's apartment. They found almost $3000 in a closet, and a gram of heroin and drug paraphernalia in Winfield's girlfriend's purse. In the garage, stashed in the trunk of Winfield's car (in a brake-fluid canister that had a hidden compartment), the police also found 27 grams of methamphetamine and 38 grams of heroin.

During a post-arrest interview, Winfield admitted that the police had not found more drugs in the apartment because "[h]e had flushed anything he had down the toilet when the SWAT team was approaching."

A grand jury charged Winfield with distributing heroin and methamphetamine, possessing both drugs with intent to distribute, and maintaining a place for the purpose of distributing controlled substances, *see* 21 U.S.C. §§ 841(a)(1), 856(a)(1). Winfield pleaded guilty to one count of distributing heroin, and the government dropped the other counts.

At sentencing, a probation officer recommended that Winfield receive a two-level upward adjustment because he "maintained a premises for the purpose of manufacturing or distributing a controlled substance," U.S.S.G. § 2D1.1(b)(12). The officer explained that this "stash house" guideline was appropriate because each of the four controlled buys had occurred at Winfield's apartment, and in his garage the police had found drugs. Winfield objected, arguing that this evidence did not support an inference that drug dealing was a "primary or principal" use for the apartment, as the guideline requires, *see* U.S.S.G. § 2D1.1 cmt. n.17.

The district court overruled Winfield's objections and applied the adjustment. The court explained that because the informant saw additional quantities of drugs during the four controlled buys, it was reasonable to believe that a buyer easily could arrange to buy drugs from Winfield at his apartment. And since Winfield at the time of his arrest primarily had been living off the proceeds of drug sales, the court reasoned, he must have been "making regular, frequent sales of drugs from his home." From this evidence, the court concluded that drug distribution was one of Winfield's primary uses for the apartment and that this warranted application of the stash-house guideline. The court then calculated an advisory range of 63–78 months' imprisonment.

The court sentenced Winfield below the guidelines range to 55 months. At the same time the court imposed a concurrent 27-month sentence because Winfield's conduct violated his supervised release for an earlier drug-trafficking conviction. (This concurrent sentence is the basis of appeal number 16-1047, but Winfield does not challenge the revocation of his supervised release.)

On appeal Winfield challenges only the district court's decision to impose the "stash house" guideline. He says the guideline was unwarranted because "this case is not the sort of multi-kilogram, long-going storage case that supports a premises enhancement."

Winfield reads too much into the guideline. Nothing in the text of § 2D1.1(b)(12) or its application note requires a sentencing court to find that the defendant stored multiple kilograms of drugs over an extended period of time; rather, the court needs to find that a drug-related activity was just one of the defendant's "primary or principal" uses for the

premises—as opposed to an "incidental or collateral" use. U.S.S.G. § 2D1.1 cmt. n.17. "In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.*

The record supports the district court's conclusion that Winfield's drug-related uses for his apartment were not merely "incidental" to his residence there. The police seized heroin and methamphetamine from Winfield's garage, and would have found drugs in the apartment itself had Winfield not—as he later admitted to police—"flushed anything he had down the toilet when the SWAT team was approaching." Moreover, in the twelve weeks before the raid, the informant bought drugs from Winfield at his apartment four times and spotted additional drugs and drug paraphernalia during each transaction. And given that Winfield at the time of his arrest was "primarily living off proceeds from drug sales," it follows, as the district court reasonably concluded, that he must have stored or sold additional quantities of drugs at his apartment than the relatively modest amounts recovered by police.

Winfield maintains that he used the apartment primarily as a place to live, so any drug distribution was "'incidental or collateral' to his predominantly lawful uses of his home." But the guideline is appropriate when a defendant uses his home for drug-related purposes. *See United States v. Sanchez*, 810 F.3d 494, 495–97 (7th Cir. 2016); *United States v. Evans*, 826 F.3d 934, 937–39 (7th Cir. 2016); *United States v. Flores-Olague*, 717 F.3d 526, 530–34 (7th Cir. 2013).

AFFIRMED.