In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 16-1721, 16-1914, 16-3375

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL CONTRERAS,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 CR 9-2 — **Amy J. St. Eve**, *Judge.*
No. 15 CR 10-2 — **Harry D. Leinenweber**, *Judge.*
No. 14 CR 544-1 — **James B. Zagel**, *Judge.*

ARGUED OCTOBER 3, 2017 — DECIDED OCTOBER 20, 2017

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

PER CURIAM. Daniel Contreras pleaded guilty to various
drug-trafficking offenses in three separately charged criminal
cases assigned to three different district judges. When calcu-
lating the guidelines range at sentencing, each district judge
applied an upward adjustment of two offense levels after
finding that Contreras maintained a premises—his home—

"for the purpose of manufacturing or distributing a controlled substance." *See* U.S.S.G. § 2D1.1(b)(12). Contreras appeals his concurrent 87-month sentences, arguing that each judge erred by not comparing the frequency of legal activity to the frequency of illegal activity that occurred at his residence. We affirm the sentences because the eight drug transactions that Contreras conducted at his home support a finding that drug trafficking was a primary use of the residence, not an incidental or collateral one.

## I.    BACKGROUND

On January 7, 2015, a grand jury returned three indictments against Contreras, charging him with drug trafficking offenses including distribution of cocaine, possession with intent to distribute cocaine, conspiracy, and unlawful use of a telephone to distribute drugs. Specifically, the indictments charged Contreras as follows:

- In Case 15 CR 9-2 (Appeal No. 16-1721), which was assigned to Judge Amy St. Eve, Contreras and two codefendants were charged with one count of distributing 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). The government alleged that on April 15, 2013, one codefendant sent a courier to Contreras's residence with a kilo of cocaine, which Contreras then stored and sold to another codefendant inside the residence.

- In Case 15 CR 10-2 (Appeal No. 16-1914), assigned to Judge Harry D. Leinenweber, the grand jury returned a 13-count indictment against Contreras and four codefendants. Contreras was charged with two counts of possession with intent to distribute 500 grams or more

of cocaine, 21 U.S.C. 841(a)(1), one count of distributing cocaine, *id*., and two counts of using a cellular phone to distribute drugs, *id*. § 843(b). The government alleged that on April 25, 2013, Contreras stole 2 kilograms of cocaine from a package that a codefendant had mailed to Contreras's home, intended for his roommate (also a codefendant). Contreras then delivered some of the stolen cocaine to a third codefendant.

- In Case 14 CR 544-1 (originally charged by complaint), which was assigned to Judge James B. Zagel, the grand jury indicted Contreras and two defendants for nine counts of drug trafficking, seven of which named Contreras. He was charged with one count of conspiracy to distribute 500 grams or more of cocaine, 21 U.S.C. §§ 846, 841(a)(1), two counts of distributing 500 grams or more of cocaine, *id*. § 841(a)(1), and four counts of using a cell phone to distribute drugs, *id*. § 843(b). The government alleged that on February 26, 2013 and March 13, 2013, a codefendant brought cocaine to Contreras at his residence. Contreras then sold this cocaine to a second co-defendant in four transactions, three occurring between March and April of 2013, and a fourth in the fall of that year. Lastly, Contreras directed his roommate to pay the first codefendant $5,000, in partial payment of a narcotics debt, at his residence.

In summary, the government alleged that Contreras engaged in a total of seven drug transactions from his home in the two-month period of March and April 2013, and one more in the fall of that year.

Contreras pleaded guilty to all counts in each of his three cases, with the exception of one count of distributing

500 grams or more of cocaine, which was dismissed from Case 15 CR 10-2. The probation officer who prepared the presentence investigation reports concluded (and both sides agreed) that Contreras's base offense level in each case was 30, and proposed in each case to add two levels under U.S.S.G. § 2D1.1(b)(12) because Contreras had "maintained a premises for the purpose of manufacturing or distributing a controlled substance." In his objections to the presentence reports and at his sentencing hearings, Contreras consistently argued that the two-level adjustment did not apply.

Judge St. Eve, the first to sentence Contreras, concluded that the two-level adjustment should be added to Contreras's offense level. Based upon the eight transactions involving wholesale quantities of cocaine that occurred at Contreras's residence, she found the sale of drugs at the premises to be more than incidental; in fact, she said, the residence was "integral" to the transactions. (R1. 73 at 8.)[1] At the next sentencing hearing, Judge Leinenweber explained that the adjustment applied because the drug activity was "almost…regular," not occasional. (R2. 112 at 4.) At the final sentencing hearing Judge Zagel also applied the two-level increase, adopting the same rationale as the other two judges, without elaboration. (R3. 195 at 16.) The defendant and his attorney (the same for each case) were present at each hearing.

After crediting Contreras with a three-level reduction for acceptance of responsibility, each judge found the total offense level to be 29. Contreras's criminal history category of I

---

[1] Citations to the record of case 15 CR 9-2 are abbreviated "R1." Citations to the record of case 15 CR 10-2 are abbreviated "R2." Citations to the record of case 15 CR 544-1 are abbreviated "R3."

resulted in a guidelines range of 87-108 months' imprisonment in each case. All three judges imposed 87-month sentences, each to run concurrently with the others.

## II.    DISCUSSION

On appeal Contreras contends that each district judge improperly applied the two-level increase to his offense level for maintaining a premises for drug distribution. He primarily argues that the judges failed to expressly compare the legal uses of his premises with the unlawful uses. Contreras relies upon Comment 17 to section 2D1.1 of the sentencing guidelines, which states that judges should "consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." Relying on a different part of the same comment, Contreras contends that drug trafficking was not a "primary or principal" use of the premises, but rather an incidental use of the home by "an ordinary drug dealer" (his term). Finally, Contreras argues that the adjustment does not apply because there were no "tools of the trade" found at his residence. None of these related arguments carries the day.

Contreras is correct that, for § 2D1.1(b)(12) to apply, manufacturing or distributing a controlled substance must be a "primary or principal" use for the premises. U.S.S.G. § 2D1.1 cmt. n. 17. But drug distribution does not need to be the sole use of a premises in order for it to constitute a "primary" use; it simply must be "more than incidental or collateral." *United States v. Acasio Sanchez*, 810 F.3d 494, 497 (7th Cir. 2016); *see United States v. Evans*, 826 F.3d 934, 938 (7th Cir. 2016). Although Contreras cites this language, his analysis seems to mistakenly equate "primary" use with "most frequent."

And contrary to Contreras's argument, to determine whether drug distribution was a primary or incidental use, the district courts are not required to apply a simple balancing test that compares the frequency of unlawful activity at the residence with the frequency of lawful uses. As we have noted, applying such a test would immunize every family home that is also used for drug distribution from being deemed an illegally maintained "premises"; the amount of lawful activity in a home is all but certain to exceed the amount of illegal activity. *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013) ("Congress in enacting [21 U.S.C.] § 856 and in directing the Commission to adopt § 2D1.1(b)(12) surely intended to deter the manufacture and distribution of illegal drugs in 'crack houses' where children are being raised.") (quoting *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012)). Instead of merely weighing the amount of legal activity against the illegal activity, the sentencing court should focus on both the frequency and significance of the illicit activities, including factors such as quantities dealt, customer interactions, keeping "tools of the trade" and business records, and accepting payment. *Flores-Olague*, 717 F.3d at 533; *United States v. Edwin Sanchez*, 710 F.3d 724, 732 (7th Cir. 2013), *vacated on other grounds*, *Sanchez v. United States*, 134 S. Ct. 146 (2013).

In these cases each judge considered both the frequency and significance of illicit activities in determining that the two-level increase applied. *See Flores-Olague*, 717 F.3d at 533. Judge St. Eve reasoned that the frequency of the transactions, in this case "eight specific transactions" in a "very short period of time," as well as the large amounts of cocaine dealt and "the government's evidence" showed that the use of Contreras's residence was "integral" to the distribution of drugs

there. (R1. 73 at 8.) We note that the judge's reference to "eight" transactions includes not just the seven that occurred in March and April 2013, but the one that occurred later that year, too. (Contreras does not contend, however, that the judge erred in lumping all eight transactions together in the "very short period of time.")

The later judges went into less detail, but they explained that their decisions were based on the regularity of the drug transactions and the rationale of the previous judge(s). Contreras does not contend that it was improper for one judge to adopt another's stated reasons for applying the adjustment to identical offense conduct.

The judges' reasoning was sound. The evidence of eight transactions, most within a two-month period, supports the courts' findings that significant deals were occurring frequently enough for the home to be deemed, in essence, a drug den for the purposes of § 2D1.1(b)(12). *See United States v. Winfield*, 846 F.3d 241, 243 (7th Cir. 2017) (upholding adjustment based on four drug transactions within twelve weeks). In addition, the evidence of the large quantities dealt each time supports the finding that the home was integral to the drug distribution. *See Edwin Sanchez*, 710 F.3d at 732. The government also presented evidence that drugs were shipped to and stored at Contreras's home, that Contreras accepted payment for drugs at his home, and that other codefendants met at Contreras's home to settle a narcotics debt. *Id*. (considering that defendant "used his residence not only for the drop-off, storage, and pick-up of drugs, but also as a secure place to settle the financials"). Although the sentencing judges did not expressly state these reasons as bases for applying the adjustment, Judge St. Eve explained that her decision was "based

on these transactions in the government's evidence."(R1. 73 at 8.)

Contreras's attempt to distinguish his case from *United States v. Acasio Sanchez*, in which we affirmed the application of the drug-premises adjustment, falls flat. In *Sanchez*, a childhood friend paid the defendant $1,500 per month to store drugs and make them available when others needed to pick them up. 810 F.3d at 495. Contreras contends that unlike Sanchez, who essentially used his residence as a warehouse for continuously receiving and storing drugs, he was an "ordinary" drug dealer (whatever that means), and drugs and drug proceeds only "occasionally passed through" his home. (Appellant's Br. at 9.) But the court in *Sanchez* did not delve into the frequency or significance of the drug activity occurring at the home, because the issues in that case were whether the defendant's minor role in a drug conspiracy foreclosed the application of the adjustment and whether he maintained sufficient control over the premises to be held responsible. *Id.* at 497. In this case, the applicability of § 2D1.1(b)(12) turns on whether drug-dealing was a primary use of the home— whether it was frequent and significant enough. It was.

In any case, under the logic of *Sanchez*, it is *more* obvious that the adjustment applies to Contreras than the defendant in that case. In *Sanchez*, the defendant did not accept payment for drugs at his home, nor did he set the price of any drugs or transport them; he may not even have known the type of drugs he was storing. *Id.* at 496. Conversely, Contreras arranged drug deals from his home and personally received drugs and took payment for them there, and here there is no dispute that Contreras exercised sufficient control over the

premises to be held responsible for the illicit activities there. *See id.* at 497.

Furthermore, our conclusion in *Sanchez* that, on the facts of that case, warehousing drugs was more than an "incidental" use of the home does not amount to a rule that storing drugs in the home is a prerequisite for applying § 2D1.1(b)(12), although Contreras would have it that way. Courts look to all the relevant facts of a particular case in determining whether a primary purpose of a dwelling is drug trafficking. *See Flores-Olague*, 717 F.3d at 533. Similarly, although Contreras emphasizes the absence of scales, baggies, firearms, or other equipment associated with drug trafficking, there is no rule that "tools of the trade" must be found in the residence for it to be considered a premises maintained for the purpose of distributing drugs. Indeed we rejected an identical argument in *Sanchez*, concluding that "tools of the trade" may suggest that drug trafficking was a principal use of the premises, but that is "not the only relevant inquiry." *Sanchez*, 810 F.3d at 497 (citing *Flores-Olague*, 717 F.3d at 533).

And even if Contreras could successfully differentiate his case from *Sanchez*, he would still run up against our recent decision in *United States v. Winfield*, 846 F.3d 241. In *Winfield*, the defendant argued that evidence of four drug sales in a twelve-week period was insufficient to demonstrate that drug distribution was a primary purpose of his home. *Id*. at 243. We concluded otherwise, and upheld the application of the adjustment over the defendant's argument that his case was not "the sort of multi-kilogram, long-going storage case that supports a premises enhancement." *Id*. Here the government presented evidence of a greater number of transactions (seven) occurring at his home in a shorter period of time (two

months). It follows that Contreras's cases are at least as likely to warrant the adjustment.

### III.    CONCLUSION

All three sentencing courts here considered the circumstances of these cases, particularly the regularity of transactions in which wholesale quantities of cocaine flowed in and out of Contreras's home. Therefore, Contreras has not demonstrated any error in the district courts' application of the two-level increase under § 2D1.1(b)(12).

For the foregoing reasons, we AFFIRM the judgment in each case.