In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2934

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FERNANDO ALVAREZ-CARVAJAL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 18-cr-30183 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED MAY 12, 2021 — DECIDED JUNE 24, 2021

Before FLAUM, HAMILTON, and BRENNAN, *Circuit Judges.*

FLAUM, *Circuit Judge.* A jury convicted defendant-appellant Fernando Alvarez-Carvajal of conspiracy to distribute methamphetamine, marijuana, and heroin for his role in an interstate drug-trafficking operation. In calculating Alvarez-Carvajal's advisory sentencing range under the U.S. Sentencing Guidelines ("U.S.S.G."), the district court applied a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) based on a finding that Alvarez-Carvajal maintained a premises for the

purpose of manufacturing or distributing a controlled substance. The district court applied another enhancement that further increased his total offense level by two levels under U.S.S.G § 3C1.1 based on a finding that Alvarez-Carvajal obstructed justice through his testimony at trial. On appeal, Alvarez-Carvajal challenges the application of both enhancements to his sentence. We now affirm the district court.

## I.     Background

### A.  Offense Conduct

In 2016, a narcotics investigation by the Federal Bureau of Investigation ("FBI") identified Edward Opoku Akwaboah, known as "Teddy," as "a wholesale distributor" of drugs throughout the United States, including in the Madison County area of southern Illinois. Teddy lived in Los Angeles and supplied local distributors with drugs delivered through the U.S. Postal Service. In 2018, the FBI used a confidential informant to conduct multiple controlled drug purchases from Teddy via the Postal Service. To further the investigation, the FBI obtained court authorization to intercept the phone calls and text messages of individuals it believed were involved in the drug-distribution conspiracy. Through the various wiretaps, the investigating agents learned that Jesus Alvarez-Duarte, known as "Porky," was supplying drugs to Teddy from Mexico. The investigation further revealed that Alvarez-Carvajal, Porky's father, served as a drug and cash courier in this operation, as did Porky's brother, Luis Alvarez-Duarte. The two men delivered drugs to and picked up money from Teddy's home. Additionally, the organization used Alvarez-Carvajal's Bank of America account to move drug proceeds.

A federal grand jury indicted Alvarez-Carvajal and five codefendants on charges related to the drug-distribution conspiracy. The sole count against Alvarez-Carvajal charged him, and the other defendants, with conspiracy to distribute and possession with intent to distribute methamphetamine, marijuana, and heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment also alleged that the conspiracy involved a mixture or substance containing methamphetamine amounting to at least 500 grams. Alvarez-Carvajal pleaded not guilty and proceeded to trial.

## B. Trial

At trial, Alvarez-Carvajal testified on his own behalf through an interpreter. He admitted that he knew Teddy and that he had been to Teddy's house. Alvarez-Carvajal denied, however, ever delivering drugs to or picking up drugs or drug money from Teddy, or storing drugs at his home, where Luis also resided. Rather, Alvarez-Carvajal testified that Teddy gave him money to help Porky during his time in jail and again when Porky was kidnapped in Mexico. Alvarez-Carvajal added that Teddy once gave him money to help with bills. He asserted that none of the money Teddy gave him was "drug money." Alvarez-Carvajal further testified that he never provided his Bank of America account information to Teddy or gave anyone permission to use the account to deposit drug proceeds. Finally, Alvarez-Carvajal denied selling drugs or arranging for the sale of drugs to his coworkers.

On cross-examination, Alvarez-Carvajal acknowledged that he knew Porky and Teddy were drug dealers. He also testified that he knew of Porky's agreement to distribute drugs and the debt Porky owed to his supplier. He further testified that he paid $9,000 toward that drug debt. Alvarez-

Carvajal denied, however, any intentional involvement in the drug-distribution conspiracy.

Alvarez-Carvajal's testimony notably conflicted with that of several other witnesses at trial. Teddy and Luis testified as cooperating witnesses for the government and described Alvarez-Carvajal's significant involvement in the conspiracy. They both testified that Alvarez-Carvajal delivered drugs to and picked up money from Teddy on Porky's behalf when Luis was "not available" to do so. They also explained that the organization stored drugs and drug money at Alvarez-Carvajal's home, and that Luis and Alvarez-Carvajal sold small amounts of methamphetamine on the side. Finally, Teddy and Luis testified that as the conspiracy progressed, the co-conspirators decided to have buyers deposit money into Alvarez-Carvajal's Bank of America account to facilitate the efficient transfer of drug proceeds to Porky. Luis added that Alvarez-Carvajal "was aware" that the organization "would be using his account for drug money" and withdrew money from the account to pay off some of the debt that he, Luis, and Porky owed to their supplier. FBI Agent Jill Carson-Kuhl, a forensic accountant, corroborated this testimony when she testified that she had tracked multiple drug payments to Alvarez-Carvajal's Bank of America account, and that Alvarez-Carvajal would withdraw large quantities of cash from the account following the transfers—indicating that the organization used Alvarez-Carvajal's account to funnel drug proceeds.

The jury found Alvarez-Carvajal guilty of conspiracy to distribute controlled substances, as charged in Count 1 of the indictment. Relevant on appeal, the jury did not find that Alvarez-Carvajal had testified falsely, and no perjury charges were brought against Alvarez-Carvajal.

### C. Sentencing

#### 1. *Presentence Investigation Report*

Following Alvarez-Carvajal's conviction, the U.S. Proba-tion Office prepared a Presentence Investigation Report ("PSR") that calculated his advisory Guidelines sentencing range. The PSR determined a base offense level of 38 but rec-ommended a pair of offense-level enhancements. First, the PSR recommended a two-offense-level increase under U.S.S.G. § 2D1.1(b)(12) because Alvarez-Carvajal "stored and allowed [methamphetamine] to be stored at his residence." Second, the PSR recommended an additional two-level in-crease under U.S.S.G. § 3C1.1 for obstruction of justice be-cause Alvarez-Carvajal "testified falsely at trial indicating that the monies he received from [Teddy] w[ere] for a legiti-mate purpose of putting money on [Porky's] jail account." With the inclusion of these sentence enhancements, the PSR concluded that Alvarez-Carvajal's total offense level was 42. Based on that total offense level and a criminal history cate-gory of I, the PSR recommended a Guidelines range of 360 months' to life imprisonment.

Alvarez-Carvajal filed objections to the PSR. He primarily objected to the application of the sentence enhancements un-der §§ 2D1.1(b)(12) and 3C1.1. He argued that no evidence in the record established that he distributed controlled sub-stances from his residence, that the jury did not find him guilty of perjury or make any finding that he testified falsely, and that he should not be punished with the obstruction of justice enhancement for exercising his constitutional right to testify at trial. Alvarez-Carvajal asserted that without these enhancements, his total offense level would have been 38,

resulting in a lower Guidelines range of 235 to 293 months' imprisonment.

In response to these objections, the Probation Office prepared an addendum to the PSR. The addendum stated that the drug-premises enhancement should apply because Alvarez-Carvajal "owned the home and paid the mortgage and stored pound-quantities of [methamphetamine] at the residence." The addendum also stated that the enhancement for obstruction of justice should apply because Alvarez-Carvajal "falsely testified that he received money from [Teddy] for the legitimate purpose of putting money on [Porky's] jail account, suggesting that the money was not for payment of illicit drugs or in furtherance of the conspiracy."

The government also filed a response to Alvarez-Carvajal's objections. In addition to adopting the arguments advanced by the Probation Office in the addendum, the government argued that the drug-premises enhancement should apply, pointing to Luis's testimony that Alvarez-Carvajal stored methamphetamine and drug proceeds in the home, sold methamphetamine stored in the home to his coworkers, and conducted a drug transaction with a member of the drug-distribution organization at the home. The government also argued that the obstruction enhancement should apply because Alvarez-Carvajal testified untruthfully under oath about several material matters—all centering on his involvement in the drug-distribution conspiracy.

### 2. *Sentencing Hearing*

At Alvarez-Carvajal's sentencing hearing, the district court heard argument regarding the objections to the PSR. Addressing first the objection to the obstruction

enhancement, Alvarez-Carvajal argued that the jury had "not convict[ed] him of perjury" or found that he lied. The government responded that Alvarez-Carvajal "testified untruthfully about several material matters, not just the money." The district court then stated that it would adopt the probation officer's recommendation and apply the § 3C1.1 enhancement for obstruction of justice.

The district court next heard argument regarding Alvarez-Carvajal's objection to the drug-premises enhancement. Alvarez-Carvajal argued that the enhancement applies when the manufacture or distribution of controlled substances represented a "primary purpose[] or principal use of [the] house, rather than [an] incidental or collateral use of the premises." Alvarez-Carvajal noted that he had lived in the home with his family for fifteen years and that the evidence at trial established that he stored drugs at the home only "on a few occasions"—therefore any drug-distribution activities amounted only to an incidental use. Relying on *United States v. Sanchez*, 810 F.3d 494 (7th Cir. 2016), the government emphasized the significance of drug-distribution activities based on trial testimony that Alvarez-Carvajal owned the home and "regularly stored drugs at the house." The district court again concluded that it would adopt the probation officer's recommendation and apply the § 2D1.1(b)(12) drug-premises enhancement.

Having overruled Alvarez-Carvajal's objections, the district court adopted the PSR's advisory Guidelines range of 360 months to life in prison. After hearing the parties' final arguments and considering the factors set forth in 18 U.S.C. § 3553(a), the district court imposed a 240-month sentence—significantly below Alvarez-Carvajal's Guidelines range. The court also sentenced Alvarez-Carvajal to five years of

supervised release and imposed a $500 fine and a $100 special assessment. In reaching this sentence, the district court not only noted that "if I have miscalculated the guidelines, I would impose the same sentence," but also elaborated that "360 months is greater than necessary, … ten years isn't sufficient, but the 20 years is for all of those reasons" the court had explained.

This appeal followed.

## II.    Discussion

Alavarez-Carvajal appeals his sentence, arguing that the district court erred when it applied the obstruction of justice and drug-premises enhancements under U.S.S.G. §§ 3C1.1 and 2D1.1(b)(12), respectively. He argues that the district court did not make the independent findings required to apply each enhancement. He also argues that the evidence adduced at trial and sentencing did not support the application of the enhancements because that evidence did not show that he testified falsely or that drug-distribution activities constituted a primary use of his home. We agree that the district court did not make separate and distinct findings regarding the enhancements. We need not determine whether the district court erred, however, because we conclude that any error in calculating Alvarez-Carvajal's total offense level and resulting Guidelines range was harmless.

"In a criminal-sentencing case, a finding of harmless error 'removes the pointless step of returning to the district court when we are convinced that the sentence the judge imposes will be identical to the one we remanded.'" *United States v. Clark*, 906 F.3d 667, 671 (7th Cir. 2018) (quoting *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009)). "To prove harmless

error, the government must be able to show that the [sentencing] error 'did not affect the district court's selection of the sentence imposed.'" *Abbas*, 560 F.3d at 667 (quoting *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008)). "For example, we have found harmless error when the sentencing court 'expresse[s] [its] determination to impose the same sentence even if [it] had gotten the calculations wrong.'" *United States v. Elder*, 900 F.3d 491, 503 (7th Cir. 2018) (alterations in original) (quoting *Abbas*, 560 F.3d at 667). A "conclusory comment tossed in for good measure," however, will not suffice. *See Abbas*, 560 F.3d at 667.

Here, the district court made clear that it would have imposed the same sentence regardless of its Guidelines calculation. After considering the sentencing factors under 18 U.S.C. § 3553(a) and announcing the 240-month sentence, the district court stated, "[n]ow, if I have miscalculated the guidelines I would impose the same sentence. So, I'd just say that I think 360 months is greater than necessary, I think ten years isn't sufficient, but the 20 years is for all of those reasons." Given this "detailed explanation of the basis for the parallel result," *see Abbas*, 560 F.3d at 667, which the district court made after thorough consideration of the § 3553(a) factors, we conclude that any error in calculating Alvarez-Carvajal's total offense level had no effect on the sentence imposed and was therefore harmless.

In reaching this conclusion, we find Alvarez-Carvajal's argument to the contrary unavailing. He contends that the district court made clear at the sentencing hearing and in its written statement of reasons that it intended to impose a below-Guidelines sentence. According to Alvarez-Carvajal, however, because the district court erred in calculating his total

offense level, the 240-month sentence it imposed fell within his correct Guidelines range of 235 to 293 months—based on a total offense level of 38 instead of 42—rather than below that range. This argument, however, mischaracterizes the district court's oral and written findings. The district court did not tether Alvarez-Carvajal's sentence to an upward or downward variance from a particular Guidelines range. For example, in its written statement of reasons the court found that "a sentence of 240 months is sufficient, but not greater than necessary, to meet the goals of sentencing" and that "anything more than a twenty year term of imprisonment would be greater than necessary to meet the objectives of sentencing." The district court made similar findings at the sentencing hearing. This record makes clear "that the district court thought the [twenty-year] sentence it chose," rather than a below-Guidelines sentence in general, "was appropriate irrespective of the Guidelines range." *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016). We can thus conclude that any errors in Alvarez-Carvajal's advisory Guidelines range were harmless.

That said, we clarify that we will not accept a district court's sentencing decision based simply on some general observation from the district judge disclaiming reliance on the court's Guidelines calculation. Best practice calls for explicit findings as to the enhancements under §§ 3C1.1 and 2D1.1(b)(12). *See United States v. Chychula*, 757 F.3d 615, 619 (7th Cir. 2014) ("When applying the [§ 3C1.1] obstruction enhancement based on perjury, the district court should make a finding as to all the factual predicates necessary for a finding of perjury: false testimony, materiality, and willful intent." (internal quotation marks and citation omitted)); *United States v. Contreras*, 874 F.3d 280, 283 (7th Cir. 2017) (per curiam)

(explaining that "for § 2D1.1(b)(12) to apply, manufacturing or distributing a controlled substance must be a 'primary or principal' use for the premises," rather than an "incidental or collateral" one) (first quoting § 2D1.1, cmt. n.17; and then quoting *Sanchez*, 810 F.3d at 497)). While we conclude that any errors in this case were harmless, we again caution that "more detail is always better than less in sentencing findings." *United States v. Burke*, 148 F.3d 832, 836 (7th Cir. 1998). District courts should continue to follow our caselaw requiring specific findings for the perjury-based obstruction enhancement and the drug-premises enhancement.

### III.    Conclusion

For the reasons explained above, we AFFIRM Alvarez-Carvajal's sentence.

HAMILTON, *Circuit Judge*, concurring. The district court wisely looked past the Sentencing Guidelines, exercised judgment and discretion under 18 U.S.C. § 3553(a), and made clear that any asserted errors in the guideline calculations would be harmless. I therefore join Judge Flaum's opinion for the court.

I write separately because the district court's abbreviated treatment of the two-level enhancement for maintaining a premises for the purpose of drug trafficking under U.S.S.G. § 2D1.1(b)(12) reflects a troubling trend in our case law. The Guideline provides: "If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels." The Sentencing Commission's commentary provides important guidance in applying "for the purpose." As most relevant here, it teaches:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's *primary or principal uses* for the premises, rather than one of the defendant's *incidental or collateral uses* for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1, cmt. n.17 (emphases added).

If we distinguish, as instructed, between primary and principal uses on one hand and incidental and collateral uses

on the other, it should be obvious that the enhancement should not apply here. Mr. Alvarez-Carvajal used his home as, well, a home—except for a few isolated drug sales, his occasional use of a drawer in the garage to store less desirable methamphetamine that was difficult for his co-conspirators to sell, and his son's use of a drawer in his room to store cash. Mr. Alvarez-Carvajal also worked two jobs; drug proceeds were not his only source of income.

We have decided cases that properly affirmed application of the enhancement to homes. See, e.g., *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013) (defendant engaged in years of daily drug sales out of his home); *United States v. Sanchez*, 710 F.3d 724, 731–32 (7th Cir. 2013), judgment vacated on other grounds, 571 U.S. 801 (2013) (defendant regularly received and stored "massive" quantities of drugs, such as up to 40 kilograms of cocaine at a time, at home, and drug trafficking was his only source of income). The problem is that in other cases, we have allowed the government to move the goalposts, affirming applications of this enhancement in cases with weaker evidence. See, e.g., *United States v. Contreras*, 874 F.3d 280, 285 (7th Cir. 2017) (defendant sold drugs out of his home eight times, with seven transactions within two months); *United States v. Winfield*, 846 F.3d 241, 243 (7th Cir. 2017) (defendant engaged in four drug transactions out of his home over twelve weeks). The government persuaded the district court here that *Contreras*, in particular, supported applying the enhancement in this case.

*Contreras* and *Winfield* may go beyond the outer limit for this "stash house" enhancement, but they are at best at that outer limit. In both cases there was stronger evidence for the

enhancement than was present here. In *Contreras*, the government also presented evidence that drugs were regularly shipped to and stored at the defendant's home, that he accepted payment for drugs at his home, and that co-defendants met at his home to settle a narcotics debt. 874 F.3d at 284. In *Winfield*, the four controlled buys turned up evidence that the premises were used much more frequently and extensively for drug trafficking, and the defendant had no other source of income. 846 F.3d at 243.

In this case, by contrast, the occasional and relatively circumscribed drug activity that occurred at Mr. Alvarez-Carvajal's residence cannot convert an otherwise normal home into a "drug den" or "stash house" given the Commission's guidance that courts must distinguish between "primary or principal uses" and "incidental or collateral" ones. To be sure, this can be a tricky question when a defendant repeatedly and consistently uses his residence for drug trafficking, as "the amount of lawful activity in a home is all but certain to exceed the amount of illegal activity." *Contreras*, 874 F.3d at 284. But we should not let a few tempting borderline cases lead us to overcorrect, resulting in unnecessarily harsh prison terms. See generally Nancy Gertner, *Losers' Rules*, 122 Yale L.J. Online 109, 109–10 (2012) (explaining processes that can contribute to one-way ratchet in development of case law). Sentencing courts would do well to stay focused on the text of the Guideline and its commentary. And a sentencing court must always consider the factors listed in 18 U.S.C. § 3553(a) and can, as in this case, forestall appellate review of a dispute over this enhancement by explaining whether the guideline issue affected its final decision. See, e.g., *Bridges v. United States*, 991 F.3d 793, 809 (7th Cir. 2021).