In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 22-3015

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RANDY SHANE CRAFT,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:19-cr-20027 — **Michael M. Mihm**, *Judge*.

_____

ARGUED DECEMBER 1, 2023 — DECIDED APRIL 22, 2024

_____

Before WOOD, ST. EVE, and LEE, *Circuit Judges*.

LEE, *Circuit Judge*. In October of 2019, Randall Craft pleaded guilty to one count of conspiracy to distribute over fifty grams of methamphetamine in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 841(b)(1)(A). Craft was sentenced to 150 months in prison followed by five years of supervised release. When calculating the guidelines range, the district court applied two sentencing enhancements. First, it applied a two-level enhancement for maintaining a

premises for the purpose of manufacturing or distributing a controlled substance under § 2D1.1(b)(12) of the United States Sentencing Guidelines. Second, it applied a two-level enhancement for Craft's role as a manager or supervisor of the scheme under § 3B1.1 of the Guidelines. Because the record does not support the conclusion that Craft used his home for the primary or principal purpose of manufacturing or distributing drugs, we conclude that the district court erred in applying the premises enhancement. On the other hand, given Craft's extensive role in the conspiracy, we agree with the district court's application of the two-level role enhancement. Thus, we vacate Craft's sentence and remand his case to the district court for resentencing.

## I.      Background

Craft and his girlfriend, Tracy Christian, lived together in Balch Springs, Texas, a suburb of Dallas. In late 2015, Craft met Frank Shaffer and started selling him methamphetamine that Shaffer would transport to Illinois and sell. At first, Craft sold Shaffer two ounces of methamphetamine at a time, but the quantity quickly increased to a half pound or full pound per transaction. During this period, Shaffer was also in and out of prison and house arrest. Thus, to carry on the operation, Shaffer enlisted others to help him obtain and transport the drugs, including two individuals named Jacob Burns and Austin Carey.

In late May 2018, Shaffer was released on parole, and he moved into Craft's home in Balch Springs, where he lived with Craft, Christian, and Craft's son. While Shaffer lived there, Craft supplied him with methamphetamine around thirty times, and each time Shaffer would transport the drugs to Illinois for distribution. Most of the time, Craft handed the

drugs to Shaffer at a nearby gas station, but on several occasions, Craft gave the drugs to Shaffer when they were both at Craft's house. Once Shaffer received the drugs from Craft, he usually stored them at Craft's house until he left for Illinois, typically less than twenty-four hours later.

After distributing the drugs in Illinois, Shaffer returned the proceeds from the sales to Craft and Christian, either directly or via wire service. Craft paid the rent and utilities for his home with the proceeds, then he split the remainder evenly with Shaffer. Craft did not store his supply of drugs at the house, nor did he regularly sell to customers from the house.

Shaffer left Craft's house in October 2018 and spent a few weeks in Illinois. While in Illinois, Shaffer was arrested for possessing a loaded firearm and one ounce of methamphetamine. After waiving his *Miranda* rights, he admitted to the police that he was distributing drugs and that Craft was his supplier. Burns and Carey also had been arrested in the preceding months, and investigations following their arrests revealed to law enforcement that Craft and Christian had been supplying them methamphetamine as well.

In April 2019, a grand jury indicted Craft and Christian on one count of conspiracy to distribute over fifty grams of methamphetamine in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 841(b)(1)(A). Craft pleaded guilty in October 2019 without a plea agreement. Shaffer, Burns, and Carey were all indicted on the same charge, but in separate cases.

In anticipation of Craft's sentencing hearing, the probation officer issued a presentence report (PSR). The PSR placed

Craft's base offense level at 32, to which it added a two-level enhancement for maintaining a premises for the purpose of distributing methamphetamine under U.S.S.G. § 2D1.1(b)(12) and a four-level enhancement under U.S.S.G. § 3B1.1(a) for Craft's role in the offense as an organizer or leader of a criminal activity involving five or more participants. After a three-level reduction for acceptance of responsibility, Craft's total offense level was 35. With a criminal history score of four, the PSR recommended a guidelines range of 210 to 262 months of imprisonment.

Craft initially only objected to the application of the premises enhancement, but he added an objection to the organizer or leader enhancement during his initial sentencing hearing. The district court gave Craft an opportunity to file a written objection regarding that enhancement. Meanwhile, the district court heard evidence as to the premises enhancement, and the government called Shaffer to testify about his involvement with Craft and Craft's role within the conspiracy.

After this initial hearing, the parties briefed the application of the leadership enhancement, then they reconvened and resumed the sentencing hearing. At the hearing, the district court adopted the factual findings of the PSR. Although the court considered it a "very close question," it overruled Craft's objection to the application of the premises enhancement. In reaching this conclusion, the court credited the fact that Craft had used the proceeds of the drug sales to pay for his rent and utilities. The district court also noted that Craft had no other income and that, on several occasions, Craft had delivered methamphetamine to Shaffer at the house.

As for the leadership enhancement, the district court found that the record did not support the PSR's

recommendation to apply a four-level enhancement for Craft's role as an organizer or leader. Nonetheless, the court found that the record supported a finding that Craft was a manager or supervisor and applied a two-level enhancement for Craft's role in the offense. To support this finding, the court observed that Craft played a "critical role" in the conspiracy. The court further noted that Craft had supplied the drugs to Shaffer and that Craft knew Shaffer would later sell them.

The district court's findings placed Craft at an offense level of 33, which resulted in a guidelines range of 168 to 210 months of imprisonment. In the end, the district court sentenced Craft to a below-guideline sentence of 150 months to be followed by a five-year term of supervised release. Craft appeals.

## II.     Analysis

Craft raises two challenges to his sentence. First, he argues that the district court erred when it applied a two-level premises enhancement under U.S.S.G. § 2D1.1(b)(12). Second, Craft maintains that the district court erred by applying a two-level enhancement for his role in the offense under U.S.S.G. § 3B1.1. We address each of Craft's arguments in turn.

### A.     Premises Enhancement

Craft first challenges the district court's application of the premises enhancement under U.S.S.G. § 2D1.1(b)(12). When considering a challenge to U.S.S.G. § 2D1.1(b)(12)'s premises enhancement, we review the district court's application of the enhancement *de novo* and its underlying factual findings for

clear error. *United States v. Flores-Olague*, 717 F.3d 526, 530 (7th Cir. 2013).

The Guidelines provide for a two-level enhancement if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The application notes to § 2D1.1(b)(12) provide that, for the enhancement to apply, manufacturing or distributing drugs need not be the "sole purpose" for which the premises was maintained. U.S.S.G. § 2D1.1 cmt. n.17. At the same time, manufacturing or distributing drugs must at least be "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.*

The application notes further provide that, to determine whether distributing a controlled substance was a primary versus collateral use of the premises, sentencing courts should ask "how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.* However, courts are not required to employ a "simple balancing test" that compares the frequency of lawful and unlawful activities. *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017). This is because "such a test would immunize every family home that is also used for drug distribution." *Id.* (citing *Flores-Olague*, 717 F.3d at 533). Instead, the sentencing court is to consider "both the frequency and significance of the illicit activities, including factors such as quantities dealt, customer interactions, keeping 'tools of the trade' and business records, and accepting payment." *Id.* (quoting *Flores-Olague*, 717 F.3d at 533).

As an initial matter, the government does not argue (nor is there evidence in the record to suggest) that Craft ever manufactured methamphetamine in the home. Thus, because the Guideline requires a defendant to have "maintained a premises for the purpose of *manufacturing or distributing* a controlled substance," the district court's application of the premises enhancement must rest on Craft's use of the home to distribute methamphetamine. U.S.S.G. § 2D1.1(b)(12) (emphasis added).

Here, the record is insufficient to support a finding that Craft maintained the premises for the "primary or principal" purpose of distributing controlled substances. The government has presented no evidence that Craft received or stored methamphetamine at his home for later distribution. And besides the "several" occasions when Craft transferred the methamphetamine to Shaffer at the home, there is no evidence that Craft sold methamphetamine to anyone else at or from the home. Nor did law enforcement officers discover any other evidence in the home, such as drug trafficking paraphernalia, that might otherwise indicate that Craft primarily used the premises for drug distribution.

We also find it significant that, besides the few occasions when Craft handed the drugs to Shaffer when they were both at the home, Craft most often transferred the drugs to Shaffer at a local gas station. The fact that Craft went out of his way to deliver the drugs to Shaffer *away* from his house (despite the fact that they both lived there) strongly indicates that distributing drugs was not a "primary or principal" use of the premises. And to the extent that Craft gave Shaffer the drugs on only "several occasions" when they were both home, these

transfers were merely incidental to Craft's (and Shaffer's) residence there.

Consider our recent decisions in this area. In *Flores-Olague*, the defendant sold and stored drugs at his home on a daily basis over a three-year period and did not attempt to demonstrate to the court that there were any limitations on these activities. 717 F.3d at 533. And, unlike the present case, "no other locations for drug dealing" appeared in the record. *Id.* Based on these facts, we found that application of the two-point premises enhancement was "clearly warranted." *Id.* We similarly affirmed the district court's application of the premises enhancement in *Contreras*, 874 F.3d at 284. In that case, the defendant's activities were less frequent than in *Flores-Olague*—rather than distributing drugs from the home on a daily basis, the defendant distributed drugs at his home on eight occasions, most occurring within a two-month period. *Id.* Still, we found that other facts made up for the relative infrequency of the defendant's sales from the home. For example, the "government also presented evidence that drugs were shipped to and stored at Contreras's home, that Contreras accepted payment for drugs at his home, and that other codefendants met at Contreras's home to settle a narcotics debt." *Id.* We also pointed to the large quantities dealt each time in upholding the enhancement. *Id.*

By contrast, the evidence that Craft maintained the home for the primary or principal purpose of distributing drugs is scant. Craft handed the drugs to Shaffer at the home as few as three times over the five-month period Shaffer lived there—even less frequently than the eight transactions in two months in *Contreras*. And unlike in *Contreras*, here we lack other evidence that might otherwise make up for the relative

infrequency of the transactions. Craft did not ship drugs to his home, nor did he personally store his supply there. And most of his transactions with Shaffer occurred outside of his home at a gas station. Unlike in *Flores-Olague* and *Contreras*, there is no evidence that Craft used his home for the primary or principal purpose of distributing drugs.

Pressing its point, the government argues that the district court properly applied the enhancement because Craft had no other job and made his entire livelihood selling methamphetamine. It is true that, in the past, we have looked to whether a defendant makes their livelihood selling drugs when determining whether the premises enhancement should apply. *See, e.g., United States v. Sanchez*, 710 F.3d 724, 732 (7th Cir. 2013), *vacated on other grounds*, 571 U.S. 801 (2013); *Flores-Olague*, 717 F.3d at 534; *United States v. Winfield*, 846 F.3d 241, 243 (7th Cir. 2017); *United States v. Hopper*, 934 F.3d 740, 765 (7th Cir. 2019). But, while this fact can move the needle somewhat by placing a defendant's home-centered drug trafficking activity in context, we have never relied on it as the primary driver of the premises enhancement.

This issue first came up in *Sanchez*, 710 F.3d at 731–32. There, we pointed to evidence that the defendant "regularly sold and stored drugs in his home" over a two-year period. *Id.* at 731. Then, to evaluate whether the activities were *significant* or *frequent* enough to consider them a principal use of the home, we noted that the defendant "was the largest wholesaler in a conspiracy responsible for nearly $2.5 million in drug trafficking" and that he "had no legitimate job and no source of income beyond his drug sales." *Id.* at 732. As a result, we concluded that the activities must have been significant, in part because of the sheer volume of sales and the

defendant's complete reliance on drug sales for his livelihood. And from this, we reasoned that the defendant's distribution must have been a principal use of the premises, thus warranting application of the enhancement.

Our later cases have largely followed the same approach, using a defendant's reliance on drug sale proceeds as one of many factors to suss out whether he had used his home for the primary or principal purpose of distributing drugs. In *Winfield*, for example, the defendant sold drugs to a confidential informant at his apartment on four different occasions over a twelve-week period. 846 F.3d at 241. When law enforcement officers searched his home pursuant to a warrant, they found a significant amount of cash, drug paraphernalia, heroin, and methamphetamine. *Id.* at 242. Later, Winfield admitted that he had flushed any drugs he had down the toilet when he realized that police officers were coming to search his home. *Id.* It was against this backdrop that we observed that Winfield had made his livelihood selling drugs and, as a result, that we thought it reasonable for the district court to conclude that Winfield "must have stored or sold additional quantities of drugs at his apartment than the relatively modest amounts recovered by police." *Id.* at 243. Together, these facts supported the conclusion that "Winfield's drug-related uses for his apartment were not merely 'incidental' to his residence there." *Id.*; *see also Flores-Olague*, 717 F.3d at 533–34 (considering a defendant's partial livelihood selling drugs only to determine the "frequency and significance of illicit activities at the premises").

These opinions teach that whether a defendant makes his livelihood selling drugs is not sufficient, by itself, to support the application of the premises enhancement. After all, the

fact that a defendant earns his entire livelihood selling drugs does not necessarily mean he manufactures or sells those drugs at his home. Any other conclusion would be divorced from the text of the enhancement, which provides for a two-level enhancement only if the premises is maintained for the purpose of "*manufacturing or distributing*" a controlled substance. U.S.S.G. § 2D1.1(b)(12) (emphasis added).

Here, the evidence does not leave us guessing as to whether distribution from Craft's home was significant or frequent. To the contrary, the evidence shows (and the government does not dispute) that Craft's distribution from the home was limited in scope—he only transferred the drugs to Shaffer there on "several" occasions, while he gave Shaffer drugs outside the home on many more. And there is no evidence that he sold drugs to anyone else from the home. In these circumstances, Craft's livelihood selling drugs cannot, standing alone, serve as the basis for the district court's application of the premises enhancement.[1]

Finally, the government insists that Shaffer's storage of the drugs at the home for up to twenty-four hours before he left for Illinois supports the application of the premises enhancement. But we also see Shaffer's fleeting storage of the drugs there as an "incidental" use of the premises—he only stored

---

[1] The district court also found it important that the proceeds of the drug sales were used to pay the household expenses. But for the same reasons just discussed, this evidence cannot by itself support the application of the premises enhancement. A defendant might use the proceeds of his drug sales to pay rent, but doing so does not suggest that drugs were manufactured in or distributed from the home.

them there for less than twenty-four hours before he left for Illinois and because he was living with Craft.

In the end, Craft's sales of drugs to Shaffer in his home were limited to "several" occasions, while most of Craft's sales to Shaffer occurred outside of his home. Thus, the record does not support a finding that Craft "maintained a premises for the purpose of manufacturing or distributing a controlled substance," and the district court erred in applying the two-level enhancement. U.S.S.G. § 2D1.1(b)(12).

## B.    Craft's Role in the Offense

Craft next argues that the record does not support the application of a two-level enhancement under U.S.S.G. § 3B1.1 for being a manager or supervisor in the drug operation. When considering a challenge to an enhancement under § 3B1.1 of the Guidelines, we review *de novo* whether the factual findings of the district court adequately support the application of the enhancement. *United States v. House*, 883 F.3d 720, 723 (7th Cir. 2018). We review the underlying factual findings for clear error. *Id.*

U.S.S.G. § 3B1.1 provides for sentencing enhancements based on a defendant's role in the offense. If a crime involved five or more participants or was "otherwise extensive," a defendant receives a four-level enhancement if he is an "organizer or leader" of the scheme under § 3B1.1(a), and a three-level enhancement if he is a "manager or supervisor" under § 3B1.1(b). If the defendant was an "organizer, leader, manager, or supervisor" but the crime did not involve five or more participants and is not "otherwise extensive," a defendant receives a two-level enhancement under § 3B1.1(c).

Although the Guidelines do not expressly define manager or supervisor, we have said that "a manager or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme." *House*, 883 F.3d at 724 (quoting *United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012)). In other words, our primary goal is to make a "commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *Id.* (quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015)).

We think there is enough evidence in the record to support application of the manager or supervisor enhancement here. Several facts indicate that Craft managed or supervised others in carrying out the operation and, therefore, is more culpable than other members of the conspiracy. For example, once the distributors sold the methamphetamine they received from Craft, Craft managed the profits, paid the household bills, and split the proceeds evenly among himself and Shaffer. *See Grigsby*, 692 F.3d at 791 (affirming application of the manager or supervisor enhancement where the defendant took custody of the proceeds and divided them among coconspirators); *see also House*, 883 F.3d at 724 (same). Craft also enlisted Shaffer and Burns to the conspiracy. *See United States v. Watts*, 535 F.3d 650, 660 (7th Cir. 2008) (upholding the application of § 3B1.1(c) because the defendant recruited his wife into a bank fraud scheme). In addition, Carey reported to law enforcement agents that Craft and Shaffer had closed-door meetings to discuss their drug business, suggesting that Craft and Shaffer were higher on the hierarchy relative to Carey and the others. *See United States v. Hawkins*, 796 F.3d 843, 872 (8th Cir. 2015) (citing defendant's participation in closed-door

meetings as evidence supporting the district court's applica-
tion of the manager or supervisor enhancement).

Craft retorts that the enhancement should not apply be-
cause he did not direct Shaffer or anyone else where to sell
drugs. But the district court adopted the PSR's factual find-
ings without objection, and the PSR found that Craft directed
Christian, demonstrating that Craft had exercised at least
*some* level of control over other participants in the operation.
We have said that, "[t]o apply the enhancement, a court need
only find that the defendant directed at least one other per-
son." *United States v. Beechler*, 68 F.4th 358, 369 (7th Cir. 2023)
(citing *United States v. Hernandez*, 309 F.3d 458, 463 (7th Cir.
2002)).

In any event, a defendant may still be eligible for the en-
hancement even without evidence that they controlled others.
*See Dade*, 787 F.3d at 1167 (stating that control is "just one
measure"). Even if we were to disregard the PSR's finding
that Craft had directed Christian, we have other evidence suf-
ficient to support a finding that Craft was a manager or super-
visor—namely, that Craft managed the proceeds, recruited
others to the conspiracy, and participated in closed-door
meetings without other members of the conspiracy.

Finally, Craft insists that his role in the operation was lim-
ited to sourcing the methamphetamine, which he says indi-
cates he was not higher on the criminal hierarchy than other
members of the operation. There is no doubt that, under our
precedent, "[s]upplying drugs and negotiating the terms of
their sale do not by themselves justify a Section 3B1.1 in-
crease." *United States v. Weaver*, 716 F.3d 439, 444 (7th Cir.
2013) (quoting *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir.
1994)). But, as discussed, here we have additional evidence

that Craft was higher on the criminal hierarchy compared to the others. Our finding that Shaffer was a manager or supervisor does not solely rest on Craft's role in supplying the drugs.

Accordingly, we find that the district court did not err in applying the manager or supervisor enhancement to Craft's sentence.[2]

### III.    Conclusion

For the foregoing reasons, we VACATE the judgment of the district court and REMAND for resentencing consistent with this opinion.

---

[2] We note that the district court applied a two-level enhancement instead of the three-level enhancement provided for in § 3B1.1(b) for managers or supervisors of crimes that involve five or more participants. Since the government did not file a cross-appeal, we do not reach this issue on appeal. *Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008).